John Heenan
Mandi Gibbs
Heenan Law Firm
3970 Avenue D, Suite A
Billings, MT 59102
Telephone: (406) 839-9091
Facsimile: (406) 839-9092
john@heenanlawfirm.com
mandi@heenanlawfirm.com

Benjamin R. Bingham*
Royal B. Lea III*
BINGHAM & LEA, P.C.
319 Maverick Street
San Antonio, Texas 78212
Telephone: (210) 224-1819
Facsimile: (210) 224-0141
ben@binghamandlea.com
royal@binghamandlea.com
* Pro Hac Vice Pending

Attorneys for Plaintiffs and the Putative Class

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| TAMEE WARD and JOSH WARD, individually and on behalf of a Class of similarly situated individuals, | Cause No.: CV-09-164-BLG-RFC-CSO |
| Plaintiffs, | |
| vs. | **COMPLAINT AND JURY DEMAND** |
| | **PUTATIVE CLASS ACTION** |
| MORGAN DREXEN, INC. and JOHN DOES I through L, | |
| Defendants. | |

COME NOW Plaintiffs, by and through their attorney of record, and for their Complaint against Defendants, complain and allege as follows:

1.      Defendants engage in a deceptive and predatory scheme to enrich themselves at the expense of financially vulnerable consumers by charging exorbitant rates to "negotiate" unsecured debts, the consequence of which is that

creditors don't get paid and Defendants' "clients" are left with destroyed credit. Defendants have actively conspired to circumvent and avoid laws governing debt settlement companies and credit repair organizations and have engaged in the unauthorized practice of law.   Plaintiffs, on behalf of themselves and others similarly situated, bring this action against Defendants in accordance with and to remedy Defendants' violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1964 et seq. ("RICO") and the federal Credit Repair Organizations Act, 15 U.S.C. § 1679 et. seq. ("CROA").

2.     Plaintiffs TAMEE WARD and JOSH WARD were at all times relevant hereto residents and citizens of the State of Montana, County of Carbon.

3.      WALTER LEDDA is a California resident who is the director and officer of Defendant MORGAN DREXEN.  LEDDA is the principal and architect of MORGAN DREXEN.  WALTER LEDDA is a participant in the scheme and enterprise described below, but Plaintiffs do not assert any claims against LEDDA at this time.

4.     Defendant MORGAN DREXEN, INC. is a Nevada corporation which does business throughout the United States, including Montana, under a variety of names, including but not limited to Morgan Drexen and the Morgan Drexen Group.

5.     HOWARD NASSIRI is a California law firm which does business throughout the United States, including Montana, and is associated with and/or the alter ego of other named defendants that do business throughout the United States, including Montana.  HOWARD NASSIRI engages in the unauthorized practice of law in states other than California.  HOWARD NASSIRI is a participant in the scheme and enterprise described below, but Plaintiffs do not assert any claims against HOWARD NASSIRI at this time.

6.     Defendants JOHN DOE I through L are persons or other business entities that have acted or are acting in concert with or are agents of the named Defendants.

7.     Jurisdiction over Plaintiffs' claim is proper in this Court pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. Sections 1332(d), 1453, and 1711-1715, and 28 U.S.C. § 1337.

8.     Personal jurisdiction is proper as Defendants have conducted debt settlement activities in the State of Montana, contracted for services with Montana residents, and committed unlawful conduct towards the State of Montana and its citizens, including Plaintiffs.

9.     Venue is proper in the Billings Division because Plaintiffs are Carbon County, Montana residents, the pertinent facts as to the Wards' claims occurred in

Carbon County, Montana, and Defendants all transact business or are otherwise found within the Billings Division.

10.     The business activities of Defendants at issue in this Complaint were within the flow of and substantially affected interstate trade and commerce.  There has been a continuous and uninterrupted flow of activities in interstate commerce throughout the class period.

## FACTS

## The Debt Settlement Process

11.     "Debt settlement," also known as "debt negotiation" is a process whereby consumers with credit card or other unsecured debt pay an amount to a debt settlement firm, which in turn, and after paying its own fees, pays a reduced amount to credit card companies who agree to accept less than the full amount owed. Typically, the consumer is instructed by the debt settlement company not to pay any amount to credit card companies, and instead make payments to an account kept by the debt management company. After the account accumulates enough to pay for the fees for the  "services" of the debt management company, the debt management company then tries to settle with credit card companies for a reduced lump sum or reduced periodic payments. The debt management company often takes an additional fee contingent upon the amount of debt reduced for the consumer. Because the consumer is not paying his or her creditors while funds are

accumulated in their debt management account, the consumer's credit report begins to show 30, 60 and 90 days or longer "past due" account status, the consumer is called by debt collectors seeking payment, or is even sued on the same debt that is the subject of the debt management plan. Because of the cost and length of time associated with debt management plans, there is a high dropout rate by consumers, and many end up filing bankruptcy anyway, having paid the cost of their debt management plan on top of their bankruptcy. The wrinkle in the MORGAN DREXEN-HOWARD NASSIRI scheme is that the consumer signs the debt management agreement not with MORGAN DREXEN but with the law firm of HOWARD NASSIRI. Under this scheme consumers purportedly hire lawyers to negotiate and settle their debts when in truth the lawyers then delegate the debt management and negotiation functions to MORGAN DREXEN.

Because of their potential for abuse by debt management firms and the potential for harm to consumers, most states regulate debt settlement companies. Most states require that debt management firms apply for and become registered or licensed in the state where they are doing business and most states require that a surety bond be posted for the protection of consumers. For example, the Montana Consumer Debt Management Services Act requires that debt management firms be registered and post a $50,000.00 surety bond. Mont. Code, 30-14-2004. however, in many states, attorneys are exempted from the licensure and bond requirements.

See, e.g. Mont. Code 30-14.2002 (b) (attorney exempt from debt management services statute if providing such services is not the principal business of the attorney). Plaintiffs assert herein that Defendants have devised a scheme to avoid the very licensing and bond requirements that have enacted by states to protect their citizens from the likes of Defendants.

### The Scheme to Avoid Debt Settlement Classification and Restrictions

12.    In May of 2004, the Federal Trade Commission filed a complaint against a group of companies and individuals, among them Defendant WALTER LEDDA, who fronted a purported non-profit debt counseling organization called the "National Consumer Council" which solicited customers through aggressive telemarketing and direct mail advertising campaign and which falsely and deceptively claimed its debt negotiation program was an effective way to stop creditors' collection efforts and eliminate debts.  LEDDA and the other individual defendants subsequently settled with the FTC by agreeing to a suspended judgment of $84,300,000 (the amount of fees the defendants received from consumers), and LEDDA was further required to pay a $1,356,000 settlement.

13.    Subsequent to the FTC enforcement action against LEDDA, LEDDA founded DEFENDANT MORGAN DREXEN, INC. ("MORGAN DREXEN"). Upon information and belief, LEDDA founded MORGAN DREXEN with the purpose and goal of continuing the same scheme of aggressively targeting and

marketing debt negotiation services to vulnerable consumers, which services falsely promised to these vulnerable consumers the ability to eliminate debts and stop creditors' collection efforts.  Upon information and belief, LEDDA controls the affairs of MORGAN DREXEN and the enterprise described below, and uses MORGAN DREXEN as a vehicle for his own personal financial gain and advantage.

14.    To facilitate the scheme, MORGAN DREXEN attempted and does attempt to disclaim, minimize, obscure and hide the fact that it is a debt negotiation/debt settlement company and seeks to circumvent state and federal regulatory authority.  To this end, MORGAN DREXEN bills itself to regulatory agencies and consumers as providing "legal support services" to debt negotiation lawyers.

15.    To further facilitate this scheme, MORGAN DREXEN has consumers enter into contracts with HOWARD NASSIRI, a California law firm which actually does business out of MORGAN DREXEN's own physical offices in California.  MORGAN DREXEN intentionally uses the HOWARD NASSIRI legal practice as a vehicle to commit the unauthorized practice of law and illegal debt negotiation services.

16.    To further facilitate the scheme, MORGAN DREXEN has entered into "rent-a-lawyer" relationships with lawyers from nearly every state in the

country, including Montana.   When lawyers agree to have their name used as "local counsel" for MORGAN DREXEN in their respective state, they are provided access to a restricted access "council pages" portion of MORGAN DREXEN's website.   Among the information provided by MORGAN DREXEN to the local attorneys lending their names is the following "Q & A":

**Q: Is Morgan Drexen a debt settlement company?**
A: No.   Morgan Drexen is a company that provides administrative legal support and services to law firms that want to provide debt settlement services to its clients.

**Q: Am I an attorney for Morgan Drexen?**
A: No.   Morgan Drexen is not a law firm.   You are an associate attorney who is of counsel to Howard Nassiri.

**Q: What is the extent of the legal services that the client is retaining us for and are we identified in the contract?**
A: Paragraph 2 of the fee agreement clearly states that the client is retaining the law firm to represent them only with respect to the negotiation and settlement of their unsecured debt.

**Q: Do we provide other legal services for the client?**
A: Yes.   If the creditor or debt collector sues the client, the client enters into a separate contract for unbundled legal services.   This is where you provide either consultation, advice, or suggested pleadings to the client so that he or she can represent himself or herself in court pro se.

**Q: Are there issues with unauthorized practice of law?**
A: No.   However, from time to time, respective state bars send inquiries about this issue.   In the past, our firm has received inquiries from state bars regarding this matter and we have been absolved of any wrongdoing in each circumstance.   Below is a sample letter that we send when Howard Nassiri receives an inquiry and when one of the other law firms receives an inquiry.   Morgan Drexen is not a law firm.   You are an associate attorney who is of counsel to Howard Nassiri. …

(Exhibit at pages 1-3.)   Upon information and belief, the lawyers who agree to serve as "associates" completely delegate authority and allow their law licenses to

be used to facilitate MORGAN DREXEN's debt negotiation business without the lawyers' oversight.

17.    MORGAN DREXEN and/or HOWARD NASSIRI provide an insurance policy funded by Lloyd's of London to its "associate" lawyers.

18.    MORGAN DREXEN develops websites for its network of "associate" lawyers throughout the nation.  For instance, the Montana "associate" lawyer's website says it is "Powered by Morgan Drexen, Inc." and has a subpage further explaining the relationship between MORGAN DREXEN and the associate attorney:

> We assist clients to settle unsecured debt, using unbundled legal services in a cost-effective way that enables us to offer our legal services without the overhead and leveraging that tend to be the mainstay for many law firms. We observe and abide by state Rules of Professional Conduct, and federal laws applicable to attorneys, paralegals, and others under our ultimate supervision. To assure greater efficiency, we use Morgan Drexen, Inc.'s outsourced paralegal and paraprofessional support.

(*See* Exhibit at 9-12.)  The Montana associate website also has a "contact us" subpage which, upon information and belief, electronically sends the prospective consumer's information directly to MORGAN DREXEN in California.  (*Id.*)

19.    MORGAN DREXEN, in the course of providing debt negotiation services, assumed and does assume authority on behalf of consumers to employ or terminate the services of attorneys and arrange the terms of and compensate for

such services.  MORGAN DREXEN further engaged and does engage in standard activities constituting the performance of legal services and the practice of law.

20.     The scheme at its core consists of LEDDA at the top, controlling and using MORGAN DREXEN as his corporate alter ego, which in turn controls and uses the law firm of HOWARD NASSIRI and its network of "associate" lawyers nationwide.  The scheme is explained by the Better Business Bureau, which has given MORGAN DREXEN an "F" rating, as follows:

> *This company claims to provide support services to law firms in the debt settlement industry. Although the company contends they do not provide debt settlement services to consumers or contract with consumers for such service, their customers disagree. Customers report the company makes monthly deductions from their bank accounts claiming the funds are saved until a sufficient amount is reached to make settlement offers to their creditors.*

21.     In July of 2009, the North Carolina State Bar completed its investigation of MORGAN DREXEN and concluded it was engaged in the unauthorized practice of law by "soliciting business in North Carolina for debt settlement on behalf of debtors by representing that it will provide the debtor with legal representation by a California law firm [Howard Nassiri]."  MORGAN DREXEN agreed as part of the action to cease taking on North Carolina customers.

22.     Also in July of 2009, the North Carolina Attorney General, in conjunction with the Federal Trade Commission and the U.S. Department of Justice, announced a "national sweep targeting scams that rip off struggling

consumers" entitled "Operation Short Change."    MORGAN DREXEN was charged as part of Operation Short Change because:

> *The company claimed that attorneys, including a North Carolina attorney, would do the debt settlement negotiations.  However, the attorneys provided no meaningful services to consumers.*

23.    Upon information and belief, the Federal Trade Commission is actively investigating MORGAN DREXEN following its receipt of hundreds of consumer complaints.

24.    Upon information and belief, MORGAN DREXEN obtains lists of debtors directly from creditors and/or debt collectors.  It then makes unsolicited contact with them by mail or telephone through aggressive sales tactics.

## Morgan Drexen Uses Telemarketers to Solicit Clients
## For the Debt Settlement Enterprise

25.    MORGAN DREXEN says that it obtains some clients for HOWARD NASSIRI and the outside "rent-a-lawyers" through radio and television commercials and through referrals by other clients.  In truth and in fact, MORGAN DREXEN obtains most of its debt settlement clients through its use of aggressive telemarketing and direct mail campaigns that solicit clients.   MORGAN DREXEN calls the telemarketers and direct mailers "lead providers."    In fact, they are contractors who MORGAN DREXEN uses to solicit consumers who are burdened by debt.

26.     The "lead providers" obtain lists of names of consumers who have significant credit card debt and call or mail letters to those consumers representing that they will introduce them to a firm that will help the consumers get out of their debt problems.  The pitch used in the solicitations creates the impression that the service will be helpful and valuable because, as presented, it will allow the consumers to satisfy their debts for a significant discount from face value faster than they could if they paid the debts in full.  Consumers interested in the services indicate their interest and the "lead providers" put the consumers in contact with a representative of MORGAN DREXEN, generally through a telephone call.  In the telephone call, MORGAN DREXEN tells the consumer that MORGAN DREXEN provides a service to assist the consumer with her debt and that, with the services of MORGAN DREXEN, the consumer will be able to eliminate her debt.

27.     The "lead providers" and the MORGAN DREXEN representatives who first talk to consumers in these scripted pitches are not lawyers.  They are, thus, similar in their roles to non-lawyer "case runners" who solicit injured persons to sign contracts with personal injury lawyers.

28.     On information and belief, the "lead providers" and the MORGAN DREXEN representatives who solicit consumers in these initial solicitations use scripts and/or are trained in what to say to the consumers so that the content and substance of the representations made to the consumers are consistent and uniform.

And in essence, the substance uniformly represented to consumers in these telephone solicitations is that MORGAN DREXEN provides a valuable, professional service to consumers that will help them—*i.e.*, make them financially better off than they would be without the service.  Consumers are uniformly led to believe in these pitches that MORGAN DREXEN and/or the lawyers it effectively controls will significantly reduce consumers' debt at a significant discount.

29.     The lead providers and representatives of MORGAN DREXEN who make these telephone pitches do not tell consumers that, in fact, they will end up paying almost as much as they would have paid if they had simply paid their debts and that, in fact, by settling their debts for significant discounts, the consumers' credit scores and reports will be significantly worsened.  Nor do the "lead providers" or telephone representatives of MORGAN DREXEN tell consumers that, in fact, the lawyers assigned to be the consumers' lawyers will do virtually nothing for them.  They do not tell the consumers that any letters sent by the MORGAN DREXEN enterprise on behalf of the consumers will be cookie-cutter form letters not signed by a lawyer, but generated by the MORGAN DREXEN form letter mill.

30.     Like thousands of other consumers, the Wards fell for this scam.

## Josh and Tamee Ward

31.    Josh and Tammy Ward are a married couple with three young children.  Like many Montanans, they struggle financially to make ends meet.  Prior to their marriage, Josh fell behind and failed to make payments on a credit card, ultimately accruing an unpaid balance of approximately $2,000.  Josh's credit card balance was sold to a company known as a "debt buyer," which purchased the debt for pennies on the dollar, and then sued Josh for the face value of the debt.  On or near May of 2009, the debt buyer obtained a default judgment against Josh, which it then sought to execute by "sweeping" Josh and Tammy's personal savings account.

32.    Within two weeks of the sweep of their bank account in June of 2009, Josh and Tammy received an unsolicited call to their home from a person who claimed to be a representative of MORGAN DREXEN.  Using a solicitation pitch like that described above in this Complaint, the MORGAN DREXEN representative promised the Wards that through MORGAN DREXEN's unique debt negotiation services, they would be able to pay off their creditors and get out of debt.  The Wards cannot allege the name of the person who made this call because they do not know the person's name.  They will attempt to obtain that person's name in discovery, and if necessary, will supplement this Complaint to provide that information.

33.     Enticed by the misleading representations of the MORGAN DREXEN telemarketer and the desire to pay off their debts, the Wards agreed to enlist the services of MORGAN DREXEN.  MORGAN DREXEN then mailed the Wards a letter explaining that, based upon the Wards' overall debt of $5,125, the MORGAN DREXEN Debt Recovery Program would enable them to make monthly payments of $128 per month for 39 months ($4,992 total), which would save them a total of $133 "upon successful completion of the Program."   In exchange for the benefit of this $133 savings, MORGAN DREXEN charged the Wards fees in excess of $2,500 (2000% more than the promised savings).  (*See* Exhibit at page 16.)

34.     MORGAN DREXEN then mailed the Wards another letter dated June 18, 2008 advising them "The firm HOWARD NASSIRI will be representing you through your journey to financial freedom.  Morgan Drexen will continue to be your point of contact."  The mailing contained an "Unsecured Debt Negotiation/Settlement-Attorney/Client Agreement" purportedly between the Wards and HOWARD NASSIRI.  The contract contained the following pertinent terms:

a.      The contract authorized Defendants to automatically withdraw funds from the Wards' account and transfer them out of state via wire.

b.     The contract provided for an "engagement fee" of $862.50; a monthly fee of $48.00 "to cover costs and expenses for facsimile transmissions, telephone charges, postage and file maintenance; and a "contingent fee equal to 25% of the difference between the full amount demanded by your creditor at the time of settlement and the amount for which that account has settled." (Exhibit at 13-15.)

35.     Pursuant to the Debt Recovery Program contract, from June of 2008 through June of 2009, Defendants electronically withdrew $174.47 each month from the Wards' bank account.  These funds were supposed to be held in trust until sufficient funds accumulated to pay the Wards' creditors, chiefly the junk debt judgment creditor.   In truth and fact, the funds were first allocated to the Defendants' fees, meaning the first nine months of trust payments went solely to Defendants, not creditors.  After that, the bulk of the funds were supposedly held "in trust" for the Wards.

36.     Information concerning the funds supposedly held in trust for the Wards came directly from MORGAN DREXEN.

37.     The Wards spoke to the Montana "associate" attorney, Blaine Bradshaw, one time.  He advised them to call the judgment creditor's Montana attorney (Bruce Spencer) directly to negotiate their outstanding debt and told the Wards to direct further inquiries to MORGAN DREXEN.  Upon information and

belief, the Montana "associate" attorney never held himself out as the Wards' attorney.

38.    Instead,   MORGAN   DREXEN/HOWARD   NASSIRI   sent correspondence in the form of a debt validation letter directly to Montana attorney Bruce Spencer at Smith Law Firm.  Rather than sign the correspondence, however, MORGAN DREXEN's name was completely omitted and the letter was falsely made to appear to come from the Wards directly.  The Wards were provided a copy of the letter as an attachment to a letter from California attorney Vincent Howard.  (Exhibit at 19-21.)

39.    Thereafter, MORGAN DREXEN sent settlement correspondence directly to Montana attorney Bruce Spencer.  (Exhibit at 22.)  No lawyer—not from HOWARD NASSIRI and not the MORGAN DREXEN Montana "associate" attorney—ever communicated with any creditor of the Wards.

40.    Upon information and belief, all of the letters and documents described herein and affecting the Wards were forms.

41.    On September 14, 2009, the Wards terminated their contract with MORGAN DREXEN by written letter and demanded repayment of the money supposedly being held "in trust."

42.    On October 28, 2009, the Wards received a refund check from HOWARD NASSIRI in the amount of $593.76.  This refund check is a fraction of

the over $1,700.00 the Wards paid to MORGAN DREXEN/HOWARD NASSIRI in exchange for no tangible benefit whatsoever.

43.     During the course of their representation by MORGAN DREXEN, the Wards had their bank accounts garnished and were forced to pay post-judgment fees because the money they thought was being used to pay off their debts was being kept by the Defendants instead.

## COUNT I
## CIVIL RICO

### Introduction

44.     Plaintiffs repeat and re-allege here as if stated here *verbatim* all of the paragraphs stated above and below in this Complaint.

45.     MORGAN DREXEN and HOWARD LEDDA have violated 18 U.S.C. § 1962(c) by conducting or participating in the conduct of an enterprise through a pattern of racketeering activity, and in all probability will continue to do so.   The Wards and the Class have been injured by reason of the conduct of MORGAN DREXEN and LEDDA described in this Complaint.   The Wards assert this Count against MORGAN DREXEN and LEDDA under 18 USC § 1964 for themselves and on behalf of the Class, and request recovery of all relief and remedies permitted under 18 USC § 1964.

## The Enterprise

46.    The enterprise on which Plaintiffs base this count is the association of MORGAN DREXEN, LEDDA, and the network of lawyers and law firms who associate with MORGAN DREXEN and/or HOWARD NASSIRI described above. Together, MORGAN DREXEN, LEDDA, and the outside lawyers have a common financial interest in misrepresenting the nature and value of the services that MORGAN DREXEN solicits to unsuspecting consumers.  Together, they receive income from the sale of the services at inflated and unfair prices.  If necessary, Plaintiffs will provide a list of the outside lawyers to supplement this identification of participants in the enterprise after they obtain such a list from MORGAN DREXEN in discovery.

47.    HOWARD NASSIRI and the outside lawyers are not employees or agents of MORGAN DREXEN.  Rather, they are independent professionals who willingly choose to participate in the enterprise to receive the income associated with the enterprise.

48.    MORGAN DREXEN, HOWARD NASSIRI, and the outside lawyers use interstate commerce to further the enterprise, and the conduct of the enterprise described here has a significant effect on interstate commerce.  MORGAN DREXEN and the outside lawyers routinely use the interstate wires and mails to communicate with each other, to advertise the services of the enterprise to

consumers, and to send and receive payments to each other and to receive payments from consumers.  Consumers pay for the worthless services by check or credit (or debit) cards, with funds being routed and transferred through the wires in the interstate banking system.

## Pattern of Racketeering Activity

49.    MORGAN DREXEN, HOWARD NASSIRI, and the outside lawyers conduct the enterprise through an ongoing, open-ended pattern of racketeering activity.  They have done so, on information and belief, for at least two years.  The predicate acts for this pattern are regular, systematic, and continuous uses by MORGAN DREXEN, HOWARD NASSIRI, and the outside lawyers of the mail, wires, and e-mail to transmit documents and communications to each other and to consumers.  The documents and communications are significant components in the scheme by MORGAN DREXEN, HOWARD NASSIRI, LEDDA, and the outside lawyers to defraud consumers into contracting to pay and into paying for the worthless debt settlement services described in this Complaint.   The use by MORGAN DREXEN, HOWARD NASSIRI, and the outside lawyers of the mail and wires to send and receive those documents violated (and violates) 18 U.S.C. §§ 1341 and 1343, the federal mail and wire fraud statutes.

50.     Plaintiffs presently allege that MORGAN DREXEN, HOWARD NASSIRI, and the outside lawyers routinely use the mails and wires to send and receive the following kinds of documents and communications:

- Telephone calls like that described above by "lead providers" or representatives of MORGAN DREXEN making a solicitation to use the debt negotiation services of MORGAN DREXEN from which consumers would receive the benefits of getting out of debt and improving their financial condition.  Plaintiffs cannot presently allege the dates of each of those calls or the names of the persons who made them in furtherance of the enterprise.  But Plaintiffs can and do allege that calls like these were made regularly in the period from at least late 2007 through the present, and Plaintiffs allege these calls continue now.  Plaintiffs allege that the calls are made using scripts or similar prompting material so that the substance of the calls is uniform in depicting MORGAN DREXEN as providing substantial financial benefits for consumers by eliminating debt and improving their financial condition.

- Letters like that attached hereto at Exhibit page 17, mailed by MORGAN DREXEN to the Wards on or near June 18, 2008.

- Letters like that attached hereto at Exhibit page 18, mailed by MORGAN DREXEN to the Wards on or near June 19, 2008.

51.    MORGAN DREXEN used the mails on or near the dates of the above referenced June 18, 2008 and June 19, 2008 letters to send the letters to the Wards, and used the mails hundreds or thousands of times to send letters similar or identical in content to those letters to the other members of the Class the Wards seek to represent.   Those telephone calls and letters furthered the scheme and enterprise described here because they induced the Wards and the other members of the Class to sign up and pay for the worthless services of MORGAN DREXEN.

52.    Plaintiffs also believe that MORGAN DREXEN and/or HOWARD NASSIRI routinely use the mails or wires to provide regular transmission of fees, and periodic reports to each of the outside lawyers of the fees or compensation due each of the outside lawyers for their participation in the scheme, as well as information related to leads and the current status of cases.   Plaintiffs cannot presently identify these reports or describe in detail their content, but a near nationwide operation such as that conducted by the Defendants and the participants cannot be operated without use of the wires (telephone, fax, Internet) and the United States' mails. Plaintiffs will obtain copies of the reports and other documents passing between MORGAN DREXEN and/or HOWARD NASSIRI and the other participants in discovery and will supplement this allegation if

necessary to provide additional information about these reports and other documents.

## **MORGAN DREXEN Conducts Affairs of Enterprise**

53.     MORGAN DREXEN conducts the affairs of the enterprise by hiring "lead providers" or employees or representatives to make the telephone solicitations described above, by causing or inducing the consumers to make payments to the enterprise, and by sending follow up letters like the letter dated May 13, 2008 and attached hereto as Exhibit page 16 and incorporated herein, after initial telephone solicitations and by arranging for consumers to hire HOWARD NASSIRI and/or the other outside lawyers.

## **Injury to Property**

54.     The Wards and each member of the Class were injured by reasons of the conduct of MORGAN DREXEN, LEDDA, HOWARD NASSIRI, and the outside lawyers described in this Complaint.  The Wards and each member of the Class suffered an out-of-pocket loss of money by paying the fees charged for the worthless services.  They received little or nothing in return—far less—than the value of the money with which they parted.  The Wards seek for themselves and for each member of the Class to recover the difference between the amount they paid and the value of what they received in return.

## COUNT II

## VIOLATION OF THE
## CREDIT REPAIR ORGANIZATIONS ACT

55.     Plaintiffs repeat and re-allege here as if stated here *verbatim* all of the paragraphs stated above and below in this Complaint.

56.     The Credit Repair Organizations Act, ("CROA") 15 U.S.C. § 1679 was enacted in 1996.  Is purposes are to ensure that prospective buyers of services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services and to protect the public from unfair or deceptive advertising and business practices by credit repair organizations. Its enactment was based on Congressional findings that "certain advertising and business practices of some companies engaged in the business of credit repair service have worked financial hardship upon consumers, particularly those of limited economic means and who are inexperienced in credit matters. 15 U.S.C. 1679(a),(b). To effect its purposes, the CROA prohibits the following conduct:

a.     making untrue or misleading statements to consumers about the organization's services; and

b.     engaging, directly or indirectly, in any practice that constitutes the commission of, or an attempt to commit a fraud or deception.

60.     The CROA also requires that credit repair organizations must include certain disclosures with or before its contract for services, including a full and detailed description of the services to be provided by the organization and a conspicuous statement in bold face type of the right to cancel the contract.  15 U.S.C. § 1679d(b).

61.     The CROA also prohibits a credit repair organization from charging or receiving any money from a consumer for the performance of any service which the organization has agreed to perform before the service is fully performed.  15 U.S.C. § 1679b(b).

62.     Defendants are a credit repair organizations as defined by the CROA because Defendants use instrumentalities of interstate commerce and the mails to sell, provide, or perform (or represent that Defendants can or will sell, provide, or perform), in return for the payment of money, services that are for express or implied purpose of improving the credit record, credit history, or credit rating of consumers and/or providing advice or assistance to consumer with respect to services that are for the express or implied purpose of improving consumer's credit record, credit history, or credit rating. For example, as recently as November 29, 2009, Defendant MORGAN DREXEN issued a press release with the headline "Morgan Drexen Warns Consumers: If you Choose Bankruptcy You Could Face a Devastating 240 Point Decline in Your FICO Score." The article continues

"Conversely, there's good news for consumers who choose debt settlement. According to the article[1], consumers can see as little as a 45 point decline, which ultimately means solid credit may be reestablished easier and faster after debt settlement as opposed to bankruptcy." The Morgan Drexen press release continues, quoting its founder LEDDA, "For many near-bankrupt consumers, debt settlement, particularly an attorney-driven debt settlement program, is almost always superior to bankruptcy. This report from FICO confirms what we've been saying all along; debt settlement does not "destroy" your credit, as some claim." LEDDA continues "…not only can debt settlement substantially reduce the principal, reduce fees and penalties, and lower outrageous interest rates, it does so with less damage to your credit score than bankruptcy." On one of its websites, MORGAN DREXEN states "You have everything to gain by consulting professional debt advisors, including a good credit score…" (www.morgandrexennewyork.com). In another Internet article, readers are directed to "start to improve your credit score" by visiting the website MorganDrexen.com. On the MORGAN DREXEN blog, consumers are told that by using of the Morgan Drexen services, "You may even improve your credit score in the process."   Similarly, on HOWARD/NASSIRI's California Bankruptcy Attorney Blog (www.Californiabankruptcyattorneyblog.com), it is

---

[1] Referring to Internet article "FICO Reveals how Common Credit Mistakes Affect Scores" Yahoo Finance, November 29, 2009)

represented that "Debt settlement offer an alternative that harms their [consumers] credit scores less and ends harassment by creditors."

64.     Defendants, violate the CROA by engaging in deceptive and fraudulent acts, including: (a) the unauthorized practice of law, (b) charging predatory fees, and (c) unregulated debt negotiation services, as follows:

a.     Defendants falsely represent that a local lawyer will be providing legal services to the consumer.  In fact, the local lawyer does little or no legal work on behalf of the consumer.

b.     Defendants fail to disclose that they are a debt settlement firm subject to the CROA and regulations under the laws of many states.

c.     Defendants fail to disclose that they do not have the license required in Montana (and similarly required in most other states) to provide debt settlement services.

d.     Defendants mislead consumers to believe that they will receive some service of some meaningful value.  In fact, consumers receive nothing of any meaningful value.  No law firm will send any letter signed by the lawyer acting on behalf of the consumer.  Instead, at most, cookie-cutter form letters are sent from Defendants or by Defendants in the name of the consumer which do nothing to benefit the consumer. Defendants charge unconscionable fees for the limited service they provide.

e. Defendants charge fees before rendering any services

d. Defendants fail to make disclosures required by the CROA, including that the consumer may cancel the contract within 3 days and that the consumer has the right to sue the credit repair organization, among other rights.

64.    Plaintiffs and the putative class have suffered damages as a result of Defendants' violations of the CROA in an amount to be determined by a jury at trial and/or in an amount equal to the amount they paid to Defendants.

65.    As a direct and proximate result of Defendants' violations of the CROA as described herein, the contracts entered into between Defendants and Plaintiffs and the putative class are void.

66.    As a direct and proximate result of Defendants' violations of the CROA as described herein, Plaintiffs, on behalf of themselves and the putative class members, are entitled to recover: (a) the greater of actual damages or the amount paid to Defendants (complete disgorgement); (b) punitive damages; and (c) costs of suit and reasonable attorney's fees pursuant to 15 U.S.C. § 1679g(a).

## CLASS DEFINITIONS, ALLEGATIONS AND INJURY TO THE CLASS

67.    Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs seek certification of a class under Rule 23.   Plaintiffs allege that hundreds or thousands of consumers have been taken by the MORGAN

DREXEN enterprise in the same way that they were.  Hundreds or thousands of debt-strapped consumer debtors have been solicited by MORGAN DREXEN to pay for its supposedly valuable debt settlement legal services that MORGAN DREXEN would provide through HOWARD NASSIRI and the network of "associate" lawyers.  Hundreds or thousands of consumers have been led to believe that by engaging MORGAN DREXEN, they would be able to satisfy their debts and be debt free.  Like the Wards, they were misled into believing that lawyers would be representing them, advising them, and providing valuable legal services that would leave them better off.  Like the Wards, they paid MORGAN DREXEN or HOWARD NASSIRI for the supposedly valuable legal services, but received little or no value in return.  The solicitations made to those consumers, and the printed material sent to those consumers to induce them to buy into the scheme, were substantially similar to those pitched to the Wards.

68.    Class Definition.  The Class is composed of all persons who entered into a Contract for debt negotiation services with Defendants and/or HOWARD NASSIRI, and who paid some amount of money for those services.

69.    Numerosity:  Upon information and belief, the class is comprised of thousands of persons and is so numerous that joinder of all members is impracticable.

70.    Commonality:  There are questions of law and/or fact common to the class.  The claims/defenses of Plaintiffs as the representative parties are typical of the claims/defenses of the class.  Further, the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and include, without limitation, the following:

a.    Whether Defendants violated 18 U.S.C. § 1962(c) or (d).

b.    Whether Defendants conducted the affairs of an enterprise through a pattern of racketeering activity (or conspired to do so).

c.  Whether Defendants violated the CROA.

d.    Whether the class is entitled to statutory relief.

e.    Whether the class is entitled to declaratory relief.

f.    Whether the class is entitled to attorney's fees and costs.

71.    Typicality and Adequacy.  Plaintiffs are adequate representatives of the class because their interests do not conflict with the interests of the class members they seeks to represent, and they are similarly situated with members of the class.   Plaintiffs, as representative parties of the class, will fairly and adequately represent and protect the interests of the class.  Furthermore, Plaintiffs' interests are not antagonistic to the class.  Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation.

72.     Predominance.  Common questions of fact or law predominate over individualized issues.   The facts surrounding Defendants' concealed debt negotiation scheme will predominate over any individualized issues because this case centers on such conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The interest of members of the class in individually controlling the prosecution of separate actions is not great given the amount in controversy and the difficulty of detection of the enterprise and proof of it; it is desirable to concentrate this litigation in one forum and there are no known difficulties likely to be encountered in the management of a class action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the putative class, respectfully request that judgment be entered against Defendants for the all damages to which they are entitled to under law as follows:

a.      Restitution, including but not limited to Defendants being required to disgorge any payments received by Plaintiffs or the putative class.

b.      Actual damages.

c.      Statutory damages.

d.      Costs and reasonable attorney's fees.

e.      Punitive or trebled damages.

f.      Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury of all of the issues in this action.

Dated this 22nd day of December, 2009.

**HEENAN LAW FIRM**


*/s/ John Heenan*
John Heenan
Attorney for Plaintiffs