John Heenan
Mandi Gibbs
Heenan Law Firm
3970 Avenue D, Suite A
Billings, Montana 59102
(406) 839-9091
(406) 839-9092 (Fax)
john@heenanlawfirm.com
mandi@heenanlawfirm.com

Benjamin R. Bingham*
Royal B. Lea III*
BINGHAM & LEA, P.C.
319 Maverick Street
San Antonio, Texas 78212
(210) 224-1819
(210) 224-0141 (Fax)
ben@binghamandlea.com
royal@binghamandlea.com
*Admitted *Pro Hac Vice*

Attorneys for Plaintiffs and the Putative Class

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| TAMEE WARD and JOSH WARD, individually and on behalf of a Class of similarly situated individuals,<br><br>Plaintiffs,<br><br>vs.<br><br>MORGAN DREXEN, INC. et al.,<br><br>Defendants. | Cause No.: CV-09-164-BLG-RFC-CSO<br><br>**PLAINTIFFS' MEMORANDUM OPPOSING DEFENDANT'S RULE 12 MOTION TO DISMISS AND TO STRIKE** |

## TABLE OF CONTENTS

**Table of Cases** ...................................................................................... 4

**Introduction—The Debt Settlement Business and Morgan Drexen** ................. 9

    A.    Debt Settlement Generally ................................................................. 9

    B.    Morgan Drexen ................................................................................. 12

**Part One—The Court Should Not Strike the Wards' Allegations of Other Complaints of Morgan Drexen's Deception** ...................................................... 16

    A.    Introduction ...................................................................................... 16

    B.    Legal Standards ................................................................................ 17

    C.    Ledda's Creation and Structuring of Morgan Drexen as a Means to Circumvent Laws Regulating Debt Settlement and Credit Repair Businesses and Keep Regulatory Authorities at Bay ............. 18

    D.    Morgan Drexen's Unauthorized Practice of Law ............................... 20

    E.    Morgan Drexen as the Target of Multiple Investigations By State and Federal Agencies ................................................................ 21

    F.    Morgan Drexen's "F" Rating From the Better Business Bureau......... 23

    G.    Morgan Drexen's Employment of "Rent-a-Lawyers" ....................... 24

**Part Two—Plaintiffs State a Claim for Civil RICO** .......................................... 25

    A.    Legal Principles of RICO and Mail and Wire Fraud ......................... 26

    B.    Plaintiffs Sufficiently Plead a Scheme to Defraud ............................. 28

        (i)    *Breach of Fiduciary Duty* ......................................................... 29

        (ii)    *Actual Fraud* ......................................................................... 32

C.    The Wards' Documents Submitted With the Complaint Do Not Preclude Morgan Drexen's Fraud .......................................................... 36

D.    Plaintiffs Satisfy the Ninth Circuit Standard For Pleading Specific Intent for Mail or Wire Fraud............................................................... 41

**Part Three—Plaintiffs State Claims Under the CROA** .................................... 42

A.    Introduction ..................................................................................... 42

B.    Morgan Drexen is a Credit Repair Organization ................................ 43

C.    Plaintiffs Sufficiently Plead Violations of the CROA ........................ 49

    (i)    *15 U.S.C. § 1679b(a)(3)—Misrepresentations* ......................... 50

    (ii)    *15 U.S.C. § 1679b(a)(4)—Fraud or Deception* ....................... 52

    (iii)    *15 U.S.C. § 1679b(b)—Mandatory Disclosures* ...................... 53

D.    Plaintiffs Sufficiently Plead Injury and Damages............................... 54

E.    Plaintiffs Have Standing Under the CROA........................................ 55

**Part Four—If the Complaint Currently Fails to State a Claim the Wards are Entitled to Amend**.................................................................................. 56

**Conclusion and Request for Relief** ....................................................... 57

**Certificate of Compliance**................................................................... 58

# **TABLE OF AUTHORITIES**

## **Cases**

*Andrews Farms v. Calcot, Ltd.*, 527 F. Supp. 2d 1239 (E.D. Cal. 2007) ......... 41, 42

*Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392 (E.D. Pa. 2006) ................................................................................................................. 32, 49

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ............................................. 41, 42

*Brazos River Auth. v. GE Ionics, Inc.* 469 F.3d 416 (5th Cir. 2006) ....................... 23

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131 (2008) .... 26, 28

*Charnay v. Cobert*, 145 Cal. App. 4th 170 (Cal. Ct. App. 2006) ............................ 33

*Cortese v. Edge Solutions, Inc.*, No. 04-0956, 2007 U.S. Dist. LEXIS 70687 (E.D.N.Y. Sep. 24, 2007) ...................................................................................... 48

*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) ........................................ 23

*Decker v. GlenFed, Inc.*, 42 F.3d 1541 (9th Cir. 1994) *(en banc)*........................... 41

*Delaware Health Care, Inc. v. MCD Holding Co.*, 893 F. Supp. 1279 (D. Del. 1995) ...................................................................................................................... 18

*Dresser Indus., Inc. v. Digges*, No. JH-89-485, 1989 U.S. Dist. LEXIS 17457 (D. Md. 1989) ............................................................................................. 29, 31, 32

*Fantasy, Inc. v. Fogerty*, 984 F.2d 1524 (9th Cir. 1993), *rev'd on other grounds,* 510 U.S. 517, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994) ................................... 19

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001) ........................................................ 45, 52

*Helms v. ConsumerInfo.com, Inc.*, 436 F. Supp. 2d 1220 (N.D. Ala. 2005) ... 47, 48, 49, 51

*Hillis v. Equifax Consumer Servs., Inc.*, 237 F.R.D. 491 (N.D. Ga. 2006) .... 48, 51, 54, 55

*In re Hayes*, 183 F.3d 162 (2d Cir. 1999) ......................................................... 29, 31

*In re Hoover*, 289 B.R. 340, 345-46 & 353 (Bankr. N.D. Ohio 2003) ................... 33

*In re Unclaimed Freight of Monroe, Inc.*, 244 B.R. 358 (Bankr. W.D. La. 1999) ................................................................................................................................. 33

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) ............... 56

*McCollough v. Johnson, Rodenberg & Lauinger*, No. CV-07-166-BLG-CSO (D. Mont. Jul. 27, 2009) .......................................................................................... 23

*Meinhard v. Salmon*, 249 N.Y. 458 (N.Y. Ct. App. 1928) ..................................... 30

*Natural Res. Def. Council v. United States E.P.A.*, 542 F.3d 1235 (9th Cir. 2008) ................................................................................................................................. 56

*New York City Employees' Ret. Sys. v. Berry*, 667 F. Supp. 2d 1121 (N.D. Cal. 2009) ................................................................................................................. 17

*Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007) .................................... 41, 42

*Perlberger v. Caplan & Luber, LLP*, 152 F. Supp. 2d 650 (E.D. Pa. 2001) .......... 33

*Scharff v. Claridge Gardens, Inc.*, No. 88-Civ.-2047, 1990 U.S. Dist. LEXIS 15776 (S.D.N.Y. 1990) ...................................................................................... 29

*Sealed Party v. Sealed Party*, No. H-04-2229, 2006 U.S. Dist. LEXIS 28392 (S.D. Tex. 2006) ............................................................................................... 30

*Slack v. Fair Isaac Corp.*, 390 F. Supp. 2d 906 (N.D. Cal. 2005) ......................... 52

*Sullivan v. Bickel & Brewer*, 943 S.W.2d 477 (Tex. App.—Dallas 1995, writ denied) ............................................................................................................. 33

*Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654 (7th Cir. 1992) ................... 17

*United States v. Amrep Corp.*, 560 F.2d 539 (2d Cir. 1977) .............................. 22, 42

*United States v. Basile*, 771 F.2d 307 (7th Cir. 1985) ............................................. 22

*United States v. Buckner*, 108 F.2d 921 (2d Cir. 1940) .................................... 28, 32

*United States v. DeVegter*, 198 F.3d 1324 (11th Cir. 1999) .................................... 32

*United States v. Hanley*, 190 F.3d 1017 (9th Cir. 1999) .............................. 27, 32, 34

*United States v. Hausmann*, 345 F.3d 952 (7th Cir. 2003) ..................................... 32

*United States v. Keane*, 522 F.2d 534 (7th Cir. 1975), *cert. denied*, 424 U.S. 976
     (1976) ............................................................................................................ 23, 26

*United States v. Kreimer*, 609 F.2d 126 (5th Cir. 1980) ......................................... 27

*United States v. Louderman*, 576 F.2d 1383 (9th Cir. 1978) .................................. 27

*United States v. Pearlstein*, 576 F.2d 531 (3d Cir. 1978) ....................................... 27

*United States v. Stanford*, 589 F.2d 285 (7th Cir. 1978) ................................... 26, 42

*Zimmermann v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254 (D.
     Mass. 2008) .......................................................................................................... 47

## Statutes

Ariz. Rev. Stat. § 6-702 .......................................................................................... 10

Ark. Code Ann. §§ 5-63-302 & 305 ......................................................................... 10

Cal. Fin. Code § 12000 *et seq.* ........................................................................... 9, 10

Colo. Rev. Stat. § 12-14.5-201 *et seq.* ..................................................................... 9

Conn. Gen. Stat. Ann. § 36a-663 ............................................................................. 10

Credit Repair Organizations Act, 15 U.S.C. § 1679 *et seq.* ............................ *passim*

Fla. Stat. Ann. § 817.801 *et seq.* ........................................................................... 9, 10

Haw. Rev. Stat. §§ 446-2 & -3 .................................................................................... 10

Idaho Code § 26-2239 ................................................................................................. 10

Mich. Comp. Laws Ann. § 451.413 ............................................................................. 10

Miss. Code § 81-22-3 .................................................................................................. 10

Mont. Code Ann. § 30-14-2001 *et seq.* .................................................................... 9, 10

N.C. Gen. Stat. §§ 14-424 & 426 ................................................................................ 10

N.D. Cent. Code § 13-06-03 ........................................................................................ 10

N.M. Stat. Ann. §§ 56-2-2 & -4 .................................................................................. 10

N.Y. Gen. Bus. Law §§ 455 & 456 ............................................................................. 10

Ohio Rev. Code Ann. § 4710.03 .................................................................................. 10

Or. Rev. Stat. § 697.612 .............................................................................................. 10

S.D. Codified Laws §§ 37-34-2 & -3 ........................................................................... 10

Tex. Fin. Code § 394.201 *et seq.* ............................................................................... 9, 10

Utah Code Ann. § 13-42-102 ....................................................................................... 10

Wash. Rev. Code Ann. § 18.28.010 *et seq.* ............................................................... 9, 10

Wyo. Stat. Ann. §§ 33-14-101 & 102 ......................................................................... 10

## **Rules**

Fed. R. of Evid. 401 .................................................................................................... 23

Fed. R. of Evid. 404 .................................................................................................... 23

Fed. R. of Evid. 406 ................................................................................... 23

## **Treatises**

Baicker-McKee, FEDERAL CIVIL RULES HANDBOOK (West 2005)......................... 17

## **Other Authorities**

Debt Management, Texas Attorney General, *at*
    www.oag.state.tx.us/consumer/consolidation.shtml ............................................. 9

*Debt Settlement Companies*, Montana Dept. of Justice, *at*
    www.doj.mt.gov/consumer/ consumer/debtsettlementcompanies.asp................. 9

*Facts for Consumers: Settling Your Credit Card Debts*, Federal Trade
    Commission, *at* www.ftc.gov/bcp/edu/pubs/consumer/credit/cre02.shtm........... 9

*State of Minnesota v. Morgan Drexen, Inc.*, No. 27-CV-10-3105 (4th Dist. Ct.
    Minn. filed Feb. 18, 2010)......................................................................... 20, 22

*The Debt Settlement Company Scam*, Illinois Attorney General, *at*
    http://www.illinoisattorneygeneral.gov/consumers/everycentcounts/Debt_Debt%
    20Settlement%20Company%20Scam.pdf............................................................. 9

# INTRODUCTION—
# THE DEBT SETTLEMENT BUSINESS AND MORGAN DREXEN

## A.  Debt Settlement Generally

Providers of debt settlement services negotiate on behalf of consumer debtors with their unsecured creditors to get the creditors to accept discounted amounts in settlement or satisfaction of the debts.  The consumer debtors generally have racked up substantial credit card or other unsecured debt in relation to their income and assets so that they cannot service the debts according to the contractually agreed schedule or according to the creditors' minimum monthly payments.

Debt settlement companies generally tell their "clients" to stop making the monthly payments on their debts to the creditors, but instead to make monthly payments to the debt settlement company.  The debt settlement company takes some portion of the monthly payments it receives for a part of its fees, and accumulates the remainder in an account for the client.  When the debt settlement company believes it has accumulated enough money to make offers to the client's creditors to settle the debts for a discount it will do so.  If any creditors accept any of the offers, the client generally then owes the debt settlement company an

additional fee—typically 25% of the amount saved or discounted off payment in full of the debt.[1]

Every state either bans for profit debt settlement or heavily regulates it. Statutes regulating debt settlement typically require licensing, bonding, background checks of officers and directors, limit amounts that can be charged up-front and in total, and impose penalties, including criminal penalties, for violations of debt settlement statutes and regulations.[2]

Two categories of persons can lawfully provide debt settlement services in Montana and most other states: (1) licensed debt settlement service providers under

---

[1] See, e.g., *Facts for Consumers: Settling Your Credit Card Debts*, Federal Trade Commission, *at* www.ftc.gov/bcp/edu/pubs/consumer/credit/cre02.shtm; *Debt Settlement Companies*, Montana Dept. of Justice, *at* www.doj.mt.gov/consumer/consumer/debtsettlementcompanies.asp; Debt Management, Texas Attorney General, *at* www.oag.state.tx.us/consumer/consolidation.shtml; *The Debt Settlement Company Scam*, Illinois Attorney General, *at* http://www.illinois attorneygeneral.gov/consumers/everycentcounts/Debt_Debt%20Settlement%20Co mpany%20Scam.pdf.

[2] See, e.g., Cal. Fin. Code § 12000 *et seq.*; Fla. Stat. Ann. § 817.801 *et seq.*; Mont. Code Ann. § 30-14-2101 *et seq.*; Tex. Fin. Code § 394.201 *et seq.*; Wash. Rev. Code Ann. § 18.28.010 *et seq.*  Several states, including Colorado, Utah, Delaware, Rhode Island, Nevada, and Tennessee, have also adopted the "Uniform Debt Management Services Act." *See, e.g.*, Colo. Rev. Stat. § 12-14.5-201 *et seq.*  In the various States' statutes, debt settlement is also referred to as "debt management," "debt management services," "debt adjustment," "prorating," or is governed by statutes governing "sale of checks," "credit services organizations," and "consumer credit service organizations."

state regulatory schemes and (2) lawyers.   Even states that totally ban debt settlement exempt lawyers from the ban.[3]

In many states, to qualify legitimately for the exception to the requirements of licensing and regulation, a lawyer providing debt settlement services must do so *incidentally* to providing other legal services.[4]   Other states presume that lawyers will act like lawyers, even when providing debt settlement services.[5] That means the lawyer must not make a regular business out of debt settlement services and that the lawyer must give the client proper legal counseling on all of the options to debt settlement—bankruptcy, debt counseling or consolidation, renegotiating interest rates and payment terms individually with each creditor to pay in full over a longer time, or contesting one or more debts in litigation.

---

[3] *See, e.g.*, Ark. Code Ann. §§ 5-63-302 & 305(1); Haw. Rev. Stat. §§ 446-2 & -3(1); N.C. Gen. Stat. §§ 14-424 & 426(6); N.M. Stat. Ann. §§ 56-2-2 & -4; N.Y. Gen. Bus. Law §§ 455(2) & 456; S.D. Codified Laws §§ 37-34-2 & -3; Wyo. Stat. Ann. §§ 33-14-101(a) & 102(a).

[4] *See, e.g.*, Ariz. Rev. Stat. § 6-702(1) (attorneys exempt from debt settlement regulation "when debt management is only incidental to their regular activities"); Idaho Code § 26-2239(1) (same); Mich. Comp. Laws Ann. § 451.413(1); Miss. Code § 81-22-3(c); Mont. Code Ann. §§ 30-14-2001 through 30-14-2015; N.D. Cent. Code § 13-06-03(1); Or. Rev. Stat. § 697.612(3); Tex. Fin. Code § 394.203(c) (attorneys excluded from regulation unless "employed, affiliated with, or otherwise working on behalf of a [debt settlement provider]"); Wash. Rev. Code Ann. § 18.28.010(2).

[5] *See, e.g.*, Ark. Code Ann. § 5-63-305(1); Cal. Fin. Code § 12100(c); Conn. Gen. Stat. Ann. § 36a-663; Fla. Stat. Ann. § 817.803(1); Ohio Rev. Code Ann. § 4710.03(B).   In states that have adopted the Uniform Debt Management Services Act, the attorney exclusion applies to "legal services provided in an attorney-client relationship ... ." *See, e.g.*, Utah Code Ann. § 13-42-102(9).

The amount of any discount off the debt in debt settlement services is often taxable income. The stopped payments for months before any discounted final debt settlement is obtained generally hurt credit scores. And for many consumers, collection efforts intensify when a consumer stops making payments. Many creditors file lawsuit, increase the collection calls, or institute garnishments after consumers sign up with a debt settlement provider. For those reasons, debt settlement is rarely a better choice compared to other options. A lawyer counseling a client would have to tell the client all of that.

### B. **Morgan Drexen**

Plaintiffs allege that Morgan Drexen has structured its business as a scheme to use the lawyer exception to the licensing and regulation requirement as a subterfuge to avoid the significant costs of fee restrictions and the bonding requirements of licensure and regulation in Montana and many other states.

Because lawyers are exempt from state restrictions or bans on debt settlement services, the "rent-a-lawyer" scheme described below is an essential component in Morgan Drexen's effort to avoid state regulations or bans.

Plaintiffs allege that Morgan Drexen solicits consumers telling them that they will hire a lawyer in their home state to provide legal services for them in representing them in negotiations with their creditors to discount the debts. Morgan Drexen tells them that it is not a law firm but a provider of "legal support

services" and that it will serve as the *point of contact* in between the consumer and the lawyer or law firm who supposedly will be representing them.

Morgan Drexen uses the Howard | Nassiri law firm and a network of what Plaintiffs call "rent-a-lawyers" to create the appearance for consumers that they will get legal services from lawyers.[6] Consumers sign legal services contracts with Howard | Nassiri in California. Howard | Nassiri says that it has an "associate attorney" licensed to practice law in the consumer's home state who will be the consumer's "lawyer." In fact, the "rent-a-lawyer" does little or nothing for the consumer. The Wards' "rent-a-lawyer" told them in his *one conversation* with them that they needed to negotiate with their creditor *on their own*. He gave them no counseling on the options to debt settlement; he gave them no explanation of the risks or disadvantages of debt settlement compared to other legal strategies available to them.

Plaintiffs call the associated lawyers in Montana and the other states "rent-a-lawyers" because, Plaintiffs allege, Morgan Drexen and Howard | Nassiri pay them to hold out their law licenses for Morgan Drexen to use. Plaintiffs allege that Morgan Drexen actually is responsible and in control of what it says to and does with its "clients" without any meaningful supervision from the "rent-a-lawyers."

---

[6] *See* Howard Nassiri website www.howardnassiri.com under the heading "Attorneys / Associates;" the "associates" are a nationwide network of lawyers, usually one lawyer per state.

The Morgan Drexen structure is a deceptive subterfuge for at least three reasons.  First, the Wards (and other consumers) were led to believe they would be paying for and receiving legal services from a lawyer.  Plaintiffs allege they did not.

Second, Plaintiffs allege that, if the truth were revealed, the Morgan Drexen structure would not qualify for the lawyer exception to the licensing and regulatory requirements for debt settlement providers.  Morgan Drexen actually runs the operation, and providing debt settlement services *is not incidental* to Morgan Drexen's business; *it is Morgan Drexen's business*.  Because no lawyer ever gives consumers candid counseling on the advantages and disadvantages of debt settlement compared to other strategies available to the "clients," what Morgan Drexen does is not incidental to anyone providing genuine legal services.

Third, because the Morgan Drexen arrangement should not qualify for the lawyer exception to the licensing and regulatory requirement, Morgan Drexen should not be able to have consumers sign contracts that require them to pay in advance for any debt settlement "services."  Charging and collecting payment before providing any service allows Morgan Drexen to profit from fees well before it ever provides any service to the "clients" who stay in the program long enough for Morgan Drexen to make any settlement offers for those clients.  Because the creditor calls, collection lawsuits, garnishments, and other collection efforts

continue unabated during the period before Morgan Drexen makes any offer to "settle" a consumer's debts, many "clients" either just stop paying the Morgan Drexen enterprise and go back to paying or dealing with (or ignoring) their creditors on their own, or they eventually file bankruptcy. However it comes to an end, the Morgan Drexen enterprise is enriched because it has collected fees in advance of providing commensurate value in services.

Plaintiffs allege that Morgan Drexen does not adequately disclose the likely risks, costs, and outcomes for its clients. Morgan Drexen led the Wards to believe that the Morgan Drexen enterprise would *improve* their financial condition. Morgan Drexen told them it would lead them to "financial freedom" and "financial recovery."[7] Morgan Drexen represented to one of their creditors that the Wards were "making significant strides in resolving their debt situation" and that Howard | Nassiri was *"assisting the Ward family … to save money to satisfy their numerous credit obligations."*[8]

A reasonable person could take those representations to mean the Wards would be better off than they were before Morgan Drexen solicited them. But that was not true. Morgan Drexen knew that there was a substantial probability that it would not be true. Morgan Drexen knew there was a substantial probability the Wards, after parting with Morgan Drexen, would be worse off than if they had

---

[7] Exhibit to FAC, Docket No. 8-1 at pp. 17 & 18.
[8] *Id.* at p. 22 (emphasis added).

never heard of Morgan Drexen—*i.e.*, their credit scores, and hence, access to credit, would be worsened and *they* would have little or no more cash on hand to buy groceries for themselves or pay their debts.

Plaintiffs allege that it was not an accident that they did not receive what Morgan Drexen led them to believe they would receive.  Plaintiffs allege that Morgan Drexen schemed to separate them and many others like them from their money by telling them that they would receive debt settlement services from a lawyer or law firm.  Plaintiffs allege that Morgan Drexen used the "rent-a-lawyers" as tokens or shills to avoid the state law requirements of bonding and fee restrictions.  Plaintiffs allege that Morgan Drexen knew that the "rent-a-lawyers" in fact would do little or nothing for the Wards and thousands of others just like them.

Plaintiffs allege that the little that was done for them was done in the Morgan Drexen boiler-room, cookie cutter operation by non-lawyers with no supervision by any lawyer in Montana.

**PART ONE–**
**THE COURT SHOULD NOT STRIKE AND SHOULD**
**CONSIDER THE WARDS'ALLEGATIONS OF OTHER**
**COMPLAINTS OF MORGAN DREXEN'S DECEPTION**

**A.  Introduction**

Morgan Drexen takes issue with the fact that Plaintiffs did not contact it to substantiate many of the allegations in the First Amended Complaint ("FAC") of

Morgan Drexen's deceptive conduct.   Morgan Drexen does not assert, however, that *any* of Plaintiffs' allegations are *untrue*.   Instead, Morgan Drexen seeks to have damaging facts stricken so that it can then seek dismissal on a complaint without factual allegations supporting Morgan Drexen's liability.

Federal courts universally perceive Rule 12(f) motions to strike as "timewasters."   Morgan Drexen's is no different.   Morgan Drexen may not like facts such as its "F" rating from the Better Business Bureau or the various governmental agencies which are scrutinizing it, but these are all not only *true,* but are directly pertinent to Plaintiffs' RICO allegations, which at their heart accuse Morgan Drexen of hiding behind nominal "rent-a-lawyers" to skirt laws and regulatory authorities which govern debt settlement companies and of knowingly cheating consumers.

## B. <u>Legal Standards</u>

Rule 12(f) of the Federal Rules of Civil Procedure allows the Court to strike from a pleading any "redundant, impertinent or scandalous matter."   Rule 12(f) motions are viewed with disfavor by federal courts and rarely granted.   Baicker-McKee, FEDERAL CIVIL RULES HANDBOOK 362 (West 2005); *see also New York City Employees' Ret. Sys. v. Berry*, 667 F. Supp. 2d 1121, 1128 (N.D. Cal. 2009) (motions to strike regarded with disfavor because of limited importance of pleading in federal practice, and because they are often used as a delaying tactic).

The FEDERAL CIVIL RULES HANDBOOK explains:

> A motion to strike redundant, immaterial, impertinent, or scandalous matter is … viewed with disfavor as a timewaster. The court will not strike such matter unless it bears no possible relation to the parties' dispute, or could confuse issues. Moreover, mere redundancy, immateriality, impertinence, or scandalousness is not sufficient to justify striking an allegation- the allegation must also be shown to be prejudicial to the moving party. Thus, absent a "strong reason for doing so," courts will generally "not tamper with pleadings."

FEDERAL CIVIL RULES HANDBOOK at 367.

"Scandalous matter does not merely offend someone's sensibilities; it must improperly cast a person or entity in a derogatory light. Moreover, such matter will not be stricken if it describes acts or events relevant to the parties' dispute, unless the descriptions contain unnecessary detail." *Id.* at 368; *see also Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 664-65 (7th Cir. 1992) (matter is scandalous only if it bears no possible relation to the controversy before the court); *Delaware Health Care, Inc. v. MCD Holding Co.*, 893 F. Supp. 1279, 1292 (D. Del. 1995) (same).

### C. Ledda's Creation and Structuring of Morgan Drexen As a Means to Circumvent Laws Regulating Debt Settlement and Credit Repair Businesses and Keep Regulatory Authorities at Bay

Morgan Drexen seeks to strike Plaintiffs' description of how and why its founder, Walter Ledda, structured Morgan Drexen. Plaintiffs allege that Ledda's former company, National Consumer Council ("NCC"), was shut down as part of an FTC consent decree in which Ledda agreed to a suspended judgment of $84

million and agreed to pay a $1.3 million fine.   These facts go to the heart of the *mens rea* of the racketeering scheme Plaintiffs allege.   Plaintiffs allege that Morgan Drexen was carefully structured to avoid regulation under laws which apply to debt settlement and credit repair companies.

The allegations concerning Morgan Drexen's previous incarnation are directly relevant to Plaintiff's RICO allegations.   Put simply, Plaintiffs allege Morgan Drexen continues to conduct the same deceptive business conduct as its predecessor, only now with the wrinkle that Morgan Drexen purportedly provides "legal support" for a network of lawyers around the country, who in turn simply lend their law licenses to Morgan Drexen so that Morgan Drexen can conduct its debt management business without regulation or oversight.   The allegations provide context for how and why Morgan Drexen attempts to avoid laws governing debt settlement companies.

The circumstances of this case are distinguishable from those of the *Fantasy, Inc. v. Fogerty* case cited by Morgan Drexen.   984 F.2d 1524 (9th Cir. 1993), *rev'd on other grounds,* 510 U.S. 517, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994).   In *Fantasy*, the Ninth Circuit approved of striking from Fogerty's counterclaim seven pages of allegations about a tax shelter plan which were time-barred and not relevant to his claim that Fantasy failed to escrow and pay song royalties.   984 F.2d at 1527-28.   Striking those allegations was logical as they had nothing to do with

Fogerty's counterclaims.  Here, Plaintiffs allegations concerning NCC are relevant as they explain and provide context for the intent required for the scheme to defraud Plaintiffs allege.

The Minnesota Attorney General also thinks the issues concerning NCC are important enough to include in her recent complaint against Morgan Drexen, and quoted almost *verbatim* from Plaintiffs' Complaint:

> 8.    In May of 2004, the Federal Trade Commission ("FTC") filed a complaint against a group of companies and individuals, including Walter Ledda. Mr. Ledda and others fronted a purported non-profit debt counseling organization called the "National Consumer Council" ("NCC"), which solicited customers through aggressive telemarketing and direct mail advertising.  NCC falsely and deceptively claimed that its debt negotiation program was an effective way to stop creditors' collection efforts and to eliminate debts.  Mr. Ledda and the other defendants subsequently settled with the FTC by agreeing to a suspended judgment of $84,300,000 (the amount of fees Mr. Ledda and the other defendants received from consumers), and Mr. Ledda was further required to pay a $1,356,000 settlement.

Compl. at 3, *State of Minnesota v. Morgan Drexen, Inc.*, No. 27-CV-10-3105 (4th Dist. Ct. Minn. filed Feb. 18, 2010) (attached hereto as Exhibit "1").  Plaintiffs' allegations about Morgan Drexen's predecessor are not scandalous and are relevant.

### D.  **Morgan Drexen's Unauthorized Practice of Law**

Morgan Drexen takes issue with Plaintiff's allegations that its scheme consists of hiding behind and using  the law licenses of attorneys in 49 states

(North Carolina, through its enforcement action, stopped Morgan Drexen) so that it can engage in debt settlement without abiding laws governing debt settlement companies. Plaintiffs allege Morgan Drexen uses these lawyers as an illegitimate means to a very profitable end. *See, e.g.,* FAC at ¶¶ 14-15.

Morgan Drexen argues that because Plaintiffs have not included an unauthorized practice of law claim their allegations about Morgan Drexen's use and manipulation of these lawyers then it cannot include these allegations in their Complaint. Morgan Drexen's argument again overlooks the fact that Morgan Drexen has been charged with engaging in a RICO scheme, part and parcel of which is the allegation that it actively conspires to circumvent and avoid laws governing debt settlement companies as well as the practice of law. *See, e.g.,* FAC at ¶ 1. Plaintiffs' allegations concerning Morgan Drexen's unauthorized practice of law and the scheme it has in place to avoid laws governing debt settlement companies are not scandalous, are relevant, and should not be stricken.

### E. Morgan Drexen as the Target of Multiple Investigations By State and Federal Agencies

Plaintiffs have alleged that Morgan Drexen has been the subject of FTC, DOJ, and state attorney general enforcement actions. FAC at ¶¶ 21-23. Tellingly, Morgan Drexen does not deny any of the allegations. And, the Minnesota Attorney General has likewise thought to include the same allegations in her recent complaint, again quoting almost *verbatim* from Plaintiffs' Complaint:

15.   In July of 2009, the North Carolina State Bar completed an investigation of MDI and concluded that MDI was engaged in the unauthorized practice of law by "soliciting business in North Carolina for debt settlement on behalf of debtors by representing that it will provide the debtor with legal representation by a California law firm." MDI agreed as part of the action to cease taking on North Carolina customers.

16.   Also in July of 2009, the North Carolina Attorney General, in conjunction with the FTC and the U.S. Department of Justice, announced a "national sweep targeting scams that rip off struggling consumers" entitled "Operation Short Change." MDI was charged as part of Operation Short Change because:

> *The company claimed that attorneys, including a North Carolina attorney, would do the debt settlement negotiations. However, the attorneys provided no meaningful services to consumers.*

Compl. at 5, *State of Minnesota v. Morgan Drexen, Inc.*, No. 27-CV-10-3105 (4th Dist. Ct. Minn. filed Feb. 18, 2010) (Exhibit "2").

Other complaints of fraud are relevant to show bad faith and fraudulent intent. *See United States v. Amrep Corp.*, 560 F.2d 539, 546 (2d Cir. 1977) ("[e]vidence of customers' complaints called to defendants' attention was also relevant on the issue of their bad faith and fraudulent intent;" citing *United States v. Press*, 336 F.2d 1003, 1010-11 (2d Cir. 1964), *cert. denied*, 379 U.S. 965 (1965)); *see also United States v. Basile*, 771 F.2d 307, 311 (7th Cir. 1985) (evidence of prior similar acts particularly appropriate to show intent for mail fraud); *United States v. Keane*, 522 F.2d 534, 559 (7th Cir. 1975), *cert. denied*, 424

U.S. 976 (1976) (same).[9]  Plaintiffs' allegations concerning Morgan Drexen being the target of multiple state and federal consumer protection actions is directly relevant to Plaintiffs' allegations of a RICO scheme.  Plaintiffs allege that Morgan Drexen has engaged in deceptive acts to "circumvent and avoid laws governing debt settlement companies ... and engage in the unauthorized practice of law."  FAC at ¶ 1.  These allegations are not scandalous and should not be stricken.

### F. Morgan Drexen's "F" Rating From the Better Business Bureau

The scheme Plaintiffs allege has been previously summarized by the Better Business Bureau:

> This company claims to provide support services to law firms in the debt settlement industry. Although the company contends they do not

---

[9] *See also* Order Denying Defendant's Motion for New Trial and to Amend Judgment in *McCollough v. Johnson, Rodenberg & Lauinger*, No. CV-07-166-BLG-CSO (D. Mont. Jul. 27, 2009) (allegations of similar bad acts were relevant and admissible to show culpable intent for punitive damages).  Federal Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Rule 401's "basic standard of relevance...is a liberal one."  *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 587 (1993).  Federal Rule of Evidence 404(b) specifically provides that evidence of other crimes, wrongs or acts may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake.  *See Brazos River Auth. v. GE Ionics, Inc.* 469 F.3d 416, 423 (5th Cir. 2006) (in a civil case, the court of appeals found "serious error" in the trial court's exclusion of evidence of prior fires at other facilities to prove a fire at a specific facility; the court also offers as the proper use of Rule 404(b) in civil cases the admission of prior acts of trade secret misappropriation to prove misappropriation in the current case).  Likewise, Federal Rule of Evidence 406 admits as relevant evidence the routine practice of an organization, whether corroborated or not, and regardless of the presence of eyewitnesses, to prove the conduct of the organization.

provide debt settlement services to consumers or contract with consumers for such service, their customers disagree. Customers report the company makes monthly deductions from their bank accounts claiming the funds are saved until a sufficient amount is reached to make settlement offers to their creditors.

FAC at ¶ 20.  The Better Business Bureau's "F" rating of Morgan Drexen is presumably based on multiple complaints by consumers, *all of whom are putative class members in this lawsuit*.  Morgan Drexen's objections to the admissibility of its "F" rating are better left for a motion in limine.  The allegation is factually true and not "scandalous" under Rule 12(f).

### G. **Morgan Drexen's Employment of "Rent-a-Lawyers"**

Plaintiffs have alleged a scheme whereby Morgan Drexen enters into "local counsel" agreements with one lawyer in each state (except North Carolina) in an effort to skirt laws governing the practice of law.  Morgan Drexen provides these lawyers with a form letter to send in response to inquiries from state bars when questioned about the unauthorized practice of law.  FAC at ¶ 16.  Plaintiffs allege that these "local counsel" lawyers completely delegate authority and allow their law licenses to be used to facilitate Morgan Drexen's debt settlement business without actual lawyer oversight.  *Id.*

Plaintiffs call these lawyers "rent-a-lawyers" to reflect the fact that Morgan Drexen is paying them to use their state law license, and not to actually function as real lawyers.  Morgan Drexen has not offered any alternate synonym for the

practice Plaintiffs have described.  This term is not scandalous and should not be stricken as it accurately describes the practice Plaintiffs allege.

## PART TWO —
## PLAINTIFFS STATE A CLAIM FOR CIVIL RICO

Morgan Drexen argues that Plaintiffs have not stated a claim for civil RICO because, according to Morgan Drexen, Plaintiffs have not stated scheme to defraud necessary to allege mail or wire fraud.[10]  Morgan Drexen also argues that its correspondence with Plaintiffs and the legal services agreement between the Howard | Nassiri firm somehow preclude Plaintiffs from alleging fraud.[11]  Finally, Morgan Drexen says that Plaintiffs have not pleaded specific intent to defraud with sufficient particularity.[12]  Morgan Drexen is wrong on all three counts.

Below, Plaintiffs first provide the general legal principles against which the Court should measure Plaintiffs' allegations of predicate acts of mail and wire fraud for their RICO claim.  Plaintiffs then demonstrate that they have pleaded a scheme to defraud, that the correspondence from Morgan Drexen and the Howard | Nassiri contract submitted with the complaint do not preclude their claims of mail and wire fraud, and that they have satisfied the Ninth Circuit rule for pleading specific intent to defraud.

---

[10] Docket No. 26 at pp. 15-17.
[11] Docket No. 26 at pp. 17-19.
[12] Docket No. 26 at p. 19.

## A. <u>Legal Principles of RICO and Mail and Wire Fraud</u>

The elements of a claim for civil RICO under 18 U.S.C. § 1962(c) are the conduct of the affairs of an enterprise "through a pattern of acts indictable as mail [or wire] fraud." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131, 2138 (2008). "The gravamen of the offense [of mail or wire fraud] is [a] scheme to defraud." *Id.*

Morgan Drexen does not challenge Plaintiffs' allegation that Morgan Drexen conducts the affairs of the enterprise. Morgan Drexen only challenges the sufficiency of Plaintiffs' allegations of predicate acts of mail and wire fraud.

The mail and wire fraud statutes[13] do not define what constitutes a scheme to defraud because "'fraud … needs no definition; it is as old as falsehood and as versable as human ingenuity.'" *United States v. Stanford*, 589 F.2d 285, 296 (7th Cir. 1978) (quoting *Weiss v. United States*, 112 F.2d 675, 681 (5th Cir.), *cert. denied*, 314 U.S. 687 (1941)). A scheme is fraudulent for the purposes of mail and wire fraud if the conduct alleged

> fails to match "the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general … life of members of society."

*Stanford*, 589 F.2d at 296 (quoting *Keane*, 522 F.2d at 544-45 (citations to internal quotation omitted); *Scharff v. Claridge Gardens, Inc.*, No. 88-Civ.-2047, 1990 U.S.

---

[13] 18 U.S.C. §§ 1341 & 1343.

Dist. LEXIS 15776, at *11-12 (S.D.N.Y. 1990).   The Ninth Circuit cited that

passage from *Keane* approvingly in *United States v. Louderman*, 576 F.2d 1383,

1388 (9th Cir. 1978).

The scheme need not be overtly "fraudulent on its face"; it is enough that the

scheme involve "some sort of fraudulent misrepresentations or omissions

reasonably calculated to deceive … ." *United States v. Pearlstein*, 576 F.2d 531,

535 (3d Cir. 1978).

Some courts have said the standard is an intent to deceive "persons of

ordinary prudence and comprehension." *Id*.   But the better standard—*and the*

*controlling standard in the Ninth Circuit*—is that the mail and wire fraud statutes

protect not only those of ordinary prudence, but also the "most gullible" as well.

*United States v. Hanley*, 190 F.3d 1017, 1023 (9th Cir. 1999).   Indeed, as the Ninth

Circuit said in *Hanley*,

> The wire-fraud statute "protects the naïve as well as the
> worldly-wise, and the former are more in need of
> protection than the latter. As a matter of fact, … the lack
> of guile on the part of those solicited may itself point with
> persuasion to the fraudulent character of the artifice."

*Id*. (emphasis added; quoting *Lemon v. United States*, 278 F.2d 369, 373 (9th Cir.

1960)); *see also United States v. Kreimer*, 609 F.2d 126, 132 (5th Cir. 1980) (the

"truly careful are … never defrauded …" so "laws protecting against fraud are

most needed to protect the careless and the naïve from lupine predators").

Because the mail and wire fraud statutes do not define or limit what is meant by fraudulent, "the word 'defraud' must be construed broadly." *United States v. Buckner*, 108 F.2d 921, 926 (2d Cir. 1940) (citing *Durland v. United States*, 161 U.S. 306, 313 & 314 (1896)). Schemes recognized as fraudulent in civil cases are similarly fraudulent for the purposes of the mail and wire fraud statutes. *Buckner*, 108 F.2d at 926 ("fraud developed in civil cases ... applicable ...").

Finally, Plaintiffs need not allege or prove that anything mailed or wired itself contain any fraudulent or false representation. Any use of the mail or wires that is "'"incident to an essential part of the scheme' ... satisfies the mailing [or wiring] element'" even if what is mailed or wired itself "'contain[s] no false information.'" *Bridge*, 128 S. Ct. at 2138 (quoting *Schmuck v. United States*, 489 U.S. 705, 712 & 715 (1989)).

## B. Plaintiffs Sufficiently Plead a Scheme to Defraud

Plaintiffs' allegations of the Morgan Drexen scheme to defraud satisfy what is required under the mail and wire fraud statutes.

As demonstrated above, a scheme is fraudulent if it fails to match the reflection of moral uprightness, fundamental honesty, fair play, and right dealing in the general life of society. So the critical questions for the Court in analyzing whether Plaintiffs have alleged a scheme to defraud are these: Did it violate moral uprightness, fundamental honesty, fair play, or right dealing for a "legal

assistant"[14] or case runner to solicit a debt-ridden consumer to contract for debtor's legal services, lead the consumer to believe that the legal assistant will arrange for the consumer client to receive valuable legal services from a lawyer but in fact deliver no meaningful legal service or value, and then to knowingly overcharge the consumer client for the worthless "services"?  Did it violate moral uprightness, fundamental honesty, fair play, or right dealing for Morgan Drexen to represent to the Wards that they would receive legal services from the Morgan Drexen "rent-a-lawyer" as a device for Morgan Drexen to avoid debt settlement licensure and regulation when, in fact, Morgan Drexen knew that the "rent-a-lawyer" would do nothing for the Wards?  The answer must be "yes."

### (i) *Breach of Fiduciary Duty*

A lawyer, of course, owes a fiduciary duty to a client.  *See, e.g., In re Hayes*, 183 F.3d 162, 168 (2d Cir. 1999); *Dresser Indus., Inc. v. Digges*, No. JH-89-485, 1989 U.S. Dist. LEXIS 17457, at * 18 (D. Md. 1989).  Because Morgan Drexen represents that it is providing (or facilitating for others to provide) legal services or providing legal support services for a lawyer, the Court should hold Morgan Drexen to the fiduciary standards that a lawyer owes a client.  The Court should conclude that Morgan Drexen owed Plaintiffs the duties of *uberrima fides*—or utmost candor, loyalty, honesty, and good faith.  *Id.*; *see also Sealed Party v.*

---

[14] Morgan Drexen admits it provides "paraprofessional" or legal assistant services. Decl. of Rita Augusta, Docket No. 30 at ¶ 7.

*Sealed Party*, No. H-04-2229, 2006 U.S. Dist. LEXIS 28392, at *22-23 (S.D. Tex. 2006).

Justice Cardozo's explanation years ago of the obligations of a fiduciary is as relevant today as it ever was:

> A trustee is held to something stricter than the morals of the market place. *Not honesty alone, but the punctilio of an honor the most sensitive*, is then the standard of behavior. As to this there has developed a tradition that is unbending and inverterate. *Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the undivided rule of loyalty* by the 'disintegrating erosion' of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.

*Meinhard v. Salmon*, 249 N.Y. 458, 464 (N.Y. Ct. App. 1928) (emphasis added; internal citation omitted).

The Wards were entitled to expect and receive the highest level of candor and disclosure from Morgan Drexen. But Morgan Drexen did not tell the Wards that they would receive essentially no value in return for what they paid. Morgan Drexen did not tell the Wards that the Montana "rent-a-lawyer" was a shill or token whose purpose was to create a cover for Morgan Drexen to avoid the requirements of licensure and regulation. Morgan Drexen did not tell the Wards that the FTC, the Better Business Bureau, or the North Carolina Attorney General

had accused Morgan Drexen of fraud or deception in doing to others exactly what Morgan Drexen proposed to do for the Wards.

Morgan Drexen did not tell the Wards that the calls and letters from their creditors would continue and even increase because the Wards' money would now be going to Morgan Drexen instead of the creditors. Morgan Drexen did not tell the Wards that the "rent-a-lawyer" Morgan Drexen would assign to them would do nothing for them.[15] In short, Morgan Drexen gave the Wards no meaningful explanation of what the arrangement would really mean for them.

Morgan Drexen breached fiduciary duties to the Wards, and in doing so, knew or reasonably should have known that it would be harming the Wards financially by separating them from their money and providing little or nothing in return. *Cf. Hayes*, 183 F.3d at 171-73 (attorney-fiduciary commits defalcation by charging exorbitant fee); *Dresser Indus.*, 1989 U.S. Dist. LEXIS, at *18 (attorney breaches fiduciary duty by overcharging).

The scheme by Morgan Drexen to breach fiduciary duties in this manner satisfies the requirements of mail and wire fraud.[16] *United States v. Hausmann*,

---

[15] FAC at ¶ 37.

[16] Some courts have said that a breach of fiduciary duty alone without evidence that the fiduciary intended to gain at the expense of his beneficiary may not satisfy the intent to deceive required for mail fraud. Because the fiduciary has a duty of absolute candor, disclosure, and loyalty, however, the fiduciary's intent to gain at the expense of his beneficiary would require the fiduciary to disclose an intention to gain at the expense of his beneficiary before acting on it. By not disclosing and

345 F.3d 952, 956 (7th Cir. 2003) (breach of fiduciary duty for gain by fiduciary at expense of beneficiary satisfies mail fraud); *United States v. DeVegter*, 198 F.3d 1324, 1328-1330 & n.7 (11th Cir. 1999) (breach of fiduciary duty with foreseeable harm is mail or wire fraud); *Buckner*, 108 F.2d at 926-27 (using fiduciary position to profit at expense of beneficiary is scheme to defraud).

### (ii) *Actual Fraud*

A scheme to induce consumers to pay an exorbitantly high amount for a good or service in relation to what the consumer will receive in return is fraudulent for the purposes of mail and wire fraud even aside from principles of fiduciary duties. *Hanley*, 190 F.3d at 1020-24 (telemarketing scheme "to persuade [consumers] to buy exorbitantly overpriced products"). A scheme by a debt management company to sell its "services" to debt ridden consumers for exorbitant fees knowing its services would provide little or nothing in return satisfied the requirement of a scheme to defraud for mail and wire fraud predicate acts in a civil RICO case. *Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 408-10 (E.D. Pa. 2006).[17]

---

acting on the intention, the fiduciary omits material information, which satisfies the requisite intent to deceive.

[17] The debt management company in *Baker* represented that it would get creditors to reduce interest rates and monthly payments. *Id.* at 397-98. But like Morgan Drexen, the defendant in *Baker* charged exorbitant fees knowing consumers would get little or no value in return. *Id.* at 409.

As demonstrated above, lawyers breach their fiduciary duty when they overcharge or charge exorbitant fees. Lawyers also commit actual fraud when they knowingly overcharge a client for legal services. *See, e.g., Perlberger v. Caplan & Luber, LLP,* 152 F. Supp. 2d 650, 654-55 (E.D. Pa. 2001) (excessive, inflated fees charged in bills sent through mail satisfy mail fraud for civil RICO); *In re Hoover,* 289 B.R. 340, 345-46 & 353 (Bankr. N.D. Ohio 2003) (intentionally charging excessive fees was both fraud and breach of fiduciary duty); *In re Unclaimed Freight of Monroe, Inc.,* 244 B.R. 358, 369 (Bankr. W.D. La. 1999) (fraudulent fee application); *Dresser Indus.,* 1989 U.S. Dist. LEXIS, at *11; *Charnay v. Cobert,* 145 Cal. App. 4th 170, 182 & n.12 (Cal. Ct. App. 2006) (intentional overbilling as fraud); *Sullivan v. Bickel & Brewer,* 943 S.W.2d 477, 481-83 (Tex. App.—Dallas 1995, writ denied) (same).

Knowingly inducing clients into a scheme in which it will charge exorbitantly high fees in relation to the value of the services provided is exactly what Plaintiffs allege Morgan Drexen has done (and continues to do). Plaintiffs allege that Morgan Drexen knowingly has lead thousands of consumers to believe that they are retaining lawyers to deliver real and valuable legal services. The consumers are among the most financially vulnerable and most needing of legal services. They have substantial credit card debt they can no longer service, are

legitimate candidates for bankruptcy protection, and many like the Wards have just lost much or all of their cash to a creditor's garnishment.

The Wards allege that Morgan Drexen knew of their plight.  Indeed, Morgan Drexen told the Wards that it was only *"[b]ecause of [their] personal hardship"* that they *"qualified for enrollment"* with Morgan Drexen."[18]

The Wards and Morgan Drexen's other victims are undoubtedly the archetypes for the Ninth Circuit rule that mail and wire fraud protect not only the reasonably prudent but also the most gullible and financially weakest of consumers. *Hanley*, 190 F.3d at 1023.

Plaintiffs allege that Morgan Drexen controls the so-called "lawyer's trust account" into which the Wards and other consumers make their payments and that Morgan Drexen purposefully pays itself out of the "trust account" for more than the value of the so called "legal services" it claims to have provided for the Wards and thousands of others.

A lawyer would commit fraud if he or she knowingly and falsely overstated the value of his or her legal services.  Morgan Drexen bills itself as a legal assistant.  A legal assistant, of course, can only work under the supervision of a lawyer.  Plaintiffs allege that, in fact, there was no lawyer actually supervising the supposed "legal work" that was supposed to have been performed for the Wards

---

[18] Exhibit to FAC, Docket No. 8-1 at p. 16 (emphasis added).

(or many other consumers). So, if as Plaintiffs allege, in fact no lawyer was actually supervising—or even actually doing—any legal work for the Wards, Morgan Drexen also fraudulently represented that a lawyer would be providing legal services for the Wards.

If there actually was a lawyer supposedly doing or supervising some "legal service" for the Wards (and others) the value of the "services" was still grossly below the amount Morgan Drexen charged and paid itself for the "services," and any lawyer would have known that.

Morgan Drexen asks the Court not to consider the apparently undisputed fact that the FTC, the Better Business Bureau, and the North Carolina Attorney General have all made similar complaints about Morgan Drexen. But those complaints support an important allegation—*i.e.*, that Morgan Drexen knows that others in a position to know about what Morgan Drexen does believe that Morgan Drexen is cheating its clients by charging them far more than the value of what they get in return.

As demonstrated at pages 22-23 in **Part One** above, allegations of complaints by others about which Morgan Drexen knows that its conduct is deceptive or misleading are relevant to show Morgan Drexen's "bad faith and fraudulent intent" in the scheme Plaintiffs allege.

## C.  The Wards' Documents Submitted With the Complaint
## Do Not Preclude Morgan Drexen's Fraud

Morgan Drexen says allegations in the Complaint describing Morgan Drexen's representations about how its services will help consumers satisfy their debts faster or at a discount do not state a claim for fraud.[19]  Morgan Drexen points out that it told the Wards in writing the specific amount of the discount they could expect and the fees they would pay so, according to Morgan Drexen, there can be no fraud.[20]

Morgan Drexen entirely ignores all of the other allegations in the Complaint. Morgan Drexen ignores the allegations that its services were (and are) worthless.[21] And to focus and amplify that allegation, Plaintiffs contend that *Morgan Drexen's services were worthless regardless of the discount Morgan Drexen promised or represented.*

Morgan Drexen did nothing for the Wards but take their money.  Morgan Drexen led the Wards to believe they would be paying for and receiving the services of a lawyer.  Morgan Drexen told the Wards that a "Law Firm" had "accept[ed] [their] case."[22]

---

[19] Docket No. 26 at pp. 15-18.
[20] *Id.*
[21] FAC at ¶¶ 29, 42, 48 & 54.
[22] Exhibit to FAC, Docket No. 8-1 at p. 16.

Morgan Drexen ignores the allegation that the "lawyer" Morgan Drexen arranged for the Wards communicated with them only once. The one time they talked with their "lawyer," the Wards' "lawyer" told the Wards they needed to negotiate with their judgment creditor *themselves*.[23] Morgan Drexen entirely ignores the allegation that their Montana lawyer never communicated on their behalf with any of their creditors to settle or negotiate any of their debts.[24]

Morgan Drexen entirely ignores the allegation that the Wards paid Morgan Drexen about $1,675 for legal services but received no tangible benefit in return whatsoever.[25] Morgan Drexen entirely ignores the allegation that, while Morgan Drexen was supposedly providing or arranging for legal services to deal with their creditors and while the Wards were paying Morgan Drexen for those "services," the Wards' bank accounts were garnished and they were forced to pay post-judgment fees because Morgan Drexen was holding their money instead of negotiating or settling their debts.[26]

Morgan Drexen's "legal services" were worthless because neither Morgan Drexen nor any "lawyer" Morgan Drexen arranged for the Wards ever provided any meaningful legal service for them. *Morgan Drexen knew that it would not provide any meaningful service. Morgan Drexen makes its money by inducing*

---

[23] FAC at ¶ 37.
[24] *Id.* at ¶¶ 36 & 37.
[25] *Id.* at ¶¶ 35 & 42.
[26] *Id.* at ¶ 43.

*consumers like the Wards into paying for legal services knowing that no legal service of any real value will ever be provided.*

The documents submitted with the Complaint demonstrate Morgan Drexen's fraud. The documents created the impression that Morgan Drexen would be arranging for Howard | Nassiri or one of its "rent-a-lawyers" to provide legal services to the Wards for their substantial debt problem—*i.e.*, that a lawyer would be advising them and negotiating for them and that a lawyer would be communicating with their creditors for them.

Morgan Drexen told the Wards that a law firm had accepted their case and that they would be receiving legal "representation" with a law "firm [as] detailed in the Attorney/Client Fee Agreement" Morgan Drexen sent the Wards.[27] Morgan Drexen told them that "Howard | Nassiri [would] be representing [them] through [their] journey to financial freedom" and that "Morgan Drexen" would "be [their] point of contact" in that journey.[28] Morgan Drexen told the Wards that it was Morgan Drexen's job to do the following:[29]

**Our Job:**

1. To tell banks and other creditors about your circumstances and inform them of the service we are providing for you. Also, to let them know how and when we will be settling your debt with them and that we will not be making monthly payments on your accounts.
2. To update the banks and other creditors of your progress in the program.
3. To negotiate settlements on your debts as the money is available to do this.

---

[27] Exhibit to FAC, Docket No. 8-1 at p. 16.

[28] *Id.* at p. 17.

[29] *Id.* at p. 18.

As far as the Wards know, no one from Morgan Drexen and certainly no "lawyer" acting on behalf of the Wards ever told any of their creditors about the Wards' circumstances.  No one could have done that because no one from Morgan Drexen or any lawyer for the Wards ever bothered to ask or learn about their financial circumstances other than to get the amounts of their unsecured debts.

As far as the Wards know, no one from Morgan Drexen ever told any of their creditors when Morgan Drexen would be settling the Wards' debts with the creditors or that Morgan Drexen would not be making monthly payments to them. If Morgan Drexen communicated anything like this to the Wards' creditors, Morgan Drexen never informed the Wards that Morgan Drexen had done so.  As far as the Wards know, no one from or with Morgan Drexen ever updated any of their creditors with any facts about the Wards' situation or progress while they were enrolled with Morgan Drexen.  And as far as the Wards know, no one ever negotiated any settlement of any of their debts for them.  Morgan Drexen did send one creditor the one letter attached to the Complaint offering one settlement.[30]  But Morgan Drexen's records indicated that the Wards had "numerous credit obligations" to creditors.[31]  As far as the Wards know, no one from Morgan Drexen ever did anything to negotiate any settlement of any of their debts other than send that one letter.

---

[30] *Id.* at p. 22.
[31] *Id.*

The Wards received no counseling from any lawyer about how or when they should pay a debt, which debt should be paid first, or if all of their debts should be discounted at the same rate.   The Wards received no legal counseling about whether bankruptcy relief might be better for them than trying to pay their debts or to settle them at a discount.   The Wards received no legal counseling from any lawyer about whether any of the telephone calls or letters they received from any creditor or collector was abusive or violated any state or federal law.   And the one debt validation letter that Morgan Drexen sent to one creditor on the Wards' behalf was a cookie-cutter form letter that was made to appear as if that it had been drafted and sent by the Wards' themselves.[32]   No lawyer's name appears anywhere on the letter.

Morgan Drexen knew before it solicited the Wards that neither Morgan Drexen nor any lawyer would ever provide any legal service of any value even closely commensurate to the fees it got from the Wards.

Plaintiffs' allegations of the Morgan Drexen scheme to defraud by charging and receiving payment for fees and providing nothing in return are plausible. Because they are plausible, the Court should not dismiss them at the pleading stage. *Andrews Farms v. Calcot, Ltd.*, 527 F. Supp. 2d 1239, 1250-53 & 1255-57

---

[32] *Id.* at pp. 20 & 21.

(E.D. Cal. 2007) (denying motion to dismiss fraud, RICO, and breach of fiduciary duty claims that met plausibility standard of *Twombly*[33]).

### D.  Plaintiffs Satisfy the Ninth Circuit Standard For Pleading Specific Intent for Mail or Wire Fraud

The Court should reject Morgan Drexen's argument that Plaintiffs have not sufficiently pleaded specific intent for mail or wire fraud.

Morgan Drexen is correct that specific intent is a necessary element of mail and wire fraud when they are alleged as predicate acts for a civil RICO claim. *Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007).  And while some aspects of mail or wire fraud must be pleaded with particularity—who was involved, when the scheme and mailings occurred, the content of the false representations—for pleading the "defendants' state of mind, general rather than particularized allegations are sufficient." *Id.*  Because intent is a state of mind and cannot be described with particularity, a general allegation of a culpable mental state suffices.  *Id.*; *Decker v. GlenFed, Inc.*, 42 F.3d 1541, 1547 (9th Cir. 1994) (*en banc*).

Thus, it is enough for pleading specific intent to defraud to allege that Morgan Drexen intended to defraud Plaintiffs.  If the aspects of the fraud for which Rule 9(b) does require particularity—the who, when, and what—support an inference of fraud, it is enough in the Ninth Circuit to say Morgan Drexen intended

---

[33] *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007).

to defraud.  Plaintiffs satisfy that standard.  *Cf. Andrews Farms*, 527 F. Supp. 2d at 1251-52 (citing *Odom* and post-*Twombly;* general allegation of "intent to deceive" sufficient).

Here, beyond the general allegation that Morgan Drexen intended to defraud, the Court should consider Plaintiffs' allegations of other complaints against Morgan Drexen that Morgan Drexen knew others in society believed its practices failed to match up with the reflection of "moral uprightness, ... fundamental honesty, fair play and right dealing"[34] expected in society.  *Amrep Corp.*, 560 F.2d at 545-46 (evidence of other complaints admissible to show bad faith or fraudulent intent).  Plaintiffs have sufficiently alleged intent to defraud.

## PART THREE—
## PLAINTIFFS STATE A CLAIM UNDER THE CROA

### A. Introduction

Morgan Drexen argues that the Wards have not stated a claim under the Credit Repair Organizations Act, 15 U.S.C. § 1679 *et seq.* ("CROA"), because Morgan Drexen says it is not a credit repair organization subject to the CROA, and even if it was, the Wards have not sufficiently pleaded fraud or deception or injury under the CROA.[35]  Again, Morgan Drexen is wrong.

---

[34] *Stanford*, 589 F.2d at 296 (and other authorities cited on pages 26-27 above).
[35] Docket No. 26 at pp. 14-19.

Plaintiffs have stated plausible claims against Morgan Drexen under the CROA. As demonstrated below, Plaintiffs sufficiently allege that Morgan Drexen is a credit repair organization, that Morgan Drexen violated the CROA by misrepresenting its services, engaging in fraud and deception, and charging fees in advance of fully performing the services, and that Morgan Drexen's violations injured Plaintiffs because they parted with money and received no valuable services from Morgan Drexen in return. Plaintiffs also demonstrate below that they have standing under the CROA.

## B. **Morgan Drexen is a Credit Repair Organization**

Morgan Drexen correctly states *some* of the definition of a "credit repair organization" under the CROA.[36] The complete definition is:

> any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—
> (i) improving any consumer's credit record, credit history, or credit rating; *or*
> *(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)*
> ....

15 U.S.C. § 1679a(3) (emphasis added). Morgan Drexen omits subsection (3)(ii). Morgan Drexen fits within the complete definition in § 1679a(3).

---

[36] Docket No. 26 at p. 14.

The Wards describe the various representations that Morgan Drexen had made through the Internet on various websites that consumers will suffer less damage to their credit reports participating in Morgan Drexen's program than if the consumers filed bankruptcy.[37]  Those representations, however, were not the only representations Morgan Drexen made about improving credit records or ratings.

Over the telephone and in numerous letters to the Wards, Morgan Drexen repeatedly told the Wards that Morgan Drexen would help the Wards "*journey to financial freedom.*"[38]  Morgan Drexen told the Wards that its mission was to "free [the Wards] from the debilitating effects of high interest rate consumer credit card debt" and "guid[e them] through the process of debt negotiation and *financial recovery.*"[39]

It is plausible that financially vulnerable and unsophisticated consumers like the Wards would believe, after hearing Morgan Drexen's pitch, that they would get more than just debt negotiation.  Morgan Drexen offered them both "debt negotiation" and "financial freedom."  Morgan Drexen offered to make them financially better off than they would be without Morgan Drexen's services.[40]

The road to "financial freedom" implies more than debt negotiation or settlement, being debt-free, or the financial ability to pay one's debts on time.

---

[37] FAC at ¶ 59.
[38] Exhibit to FAC, Docket No. 8-1 at pp. 17 & 19 (emphasis added).
[39] *Id.* at pp. 17-18 (emphasis added).
[40] FAC at ¶ 28.

Traveling the "road" and "journeying" to "financial freedom" reasonably imply improving one's credit record, history, and rating and having access to consumer credit. Likewise, a poor credit record, history, or rating is plausibly one of the "debilitating effects of high interest rate consumer credit card debt" that consumers seeking debt negotiation or settlement services experience and that Morgan Drexen told the Wards it would free them of.[41]

Many consumers equate access to credit with financial well being. Many consumers believe that with additional credit, they have additional wealth. Recognizing this fact, the Court of Appeals observed in *FTC v. Gill* that credit repair firms often promise "'new-found wealth in the form of available credit.'" 265 F.3d 944, 949 (9th Cir. 2001) (quoting congressional history of CROA at 134 Cong. Rec. H6707-06 daily ed. Aug. 9, 1988). A consumer reasonably could take Morgan Drexen's promises of "financial freedom" and "financial recovery" to mean that Morgan Drexen would gain them access to financial well being through improving their credit ratings by helping them satisfy their debts.

A boiler-plate disclaimer in the Howard | Nassiri legal services contract on the possibility of debt settlement worsening a client's credit score cannot serve to bar to this claim at the pleading state for several reasons. First, Morgan Drexen

---

[41] *Id.* at ¶ 34; Exhibit to FAC, Docket No. 8-1 at p. 17.

does not make the disclaimer; Howard | Nassiri does.[42]   Second, the disclaimer is

not conspicuous, and is overshadowed by Morgan Drexen's more prominent

representations about delivering consumers like the Wards to "financial freedom"

or "recovery."

Moreover, in the cookie-cutter debt validation letter that Morgan Drexen

generated and sent without the Wards' knowledge to counsel for the Wards'

creditor as if it came directly from the Wards, Morgan Drexen wrote:[43]

> **At this time I will also inform you that if your offices have reported invalidated information to any of the 3 major Credit Bureau's (Equifax, Experian or TransUnion) this action may constitute fraud under both Federal and State Laws.** Due to this fact, if any negative mark is found on any of my credit reports by your company or the company that you represent I will not hesitate in bringing legal action against you for the following:
>
> - **Violation of the Fair Credit Reporting Act**
> - **Violation of the Fair Debt Collection Practices Act**
> - **Defamation of Character**
>
> . . .
>
> Also during this validation period, if any action is taken which could be considered detrimental to any of my credit reports, I will consult with my legal counsel for suit. This includes any listing any information to a credit-reporting repository that could be inaccurate or invalidated or verifying an account as accurate when in fact there is no provided proof that it is.

The Wards received a copy of this letter sent with their names on it.[44]

The services Morgan Drexen did "provide" to the Wards included the debt

validation letter generated by Morgan Drexen excerpted above and attached to the

---

[42] Exhibit to FAC, Docket No. 8-1 at pp. 13-15.
[43] Exhibit to FAC, Docket No. 8-1 at pp. 20-21.
[44] FAC at ¶ 38; Exhibit to FAC, Docket No. 8-1 at pp. 19-21.

Complaint. That letter advised the Wards of information regarding their credit record and rating. The letter expressly mentioned the Wards' credit record and demanded that the Wards' creditor remove any "invalidated information" or "negative mark" from the Wards' credit reports.[45] That letter also threatened legal action against the creditor if it took "any action ... which could be considered detrimental to [the Wards'] credit reports."[46]

The Court may consider representations by Morgan Drexen about its credit repair services even if the Wards did not directly see or receive those representations. The "CROA does not require reliance on an entity's representations in order for it to be considered a credit repair organization." *Zimmermann v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254, 274 n.18 (D. Mass. 2008) (court properly considered website advertising materials not seen by plaintiffs to determine defendant's status as a credit repair organization where the website information was consistent with defendant's sales pitch); *see also Helms v. ConsumerInfo.com, Inc.*, 436 F. Supp. 2d 1220, 1231 n.13 (N.D. Ala. 2005) (denying summary judgment because court "need not limit itself to only those webpages or statements which Plaintiff recalls seeing;" "the CROA does not have any requirement of reliance"). Under the "plain language" of the statute, "it is

---

[45] Exhibit to FAC, Docket No. 8-1 at p. 20.
[46] *Id.* at pp. 20-21.

enough that Plaintiff purchased Defendant's ... service." *Helms*, 436 F. Supp. 2d at 1231 n. 13.

The definition of "credit repair organization" is not limited to express representations of improving credit records, histories, or ratings. "[T]he definition covers implied as well as express representations." *Cortese v. Edge Solutions, Inc.*, No. 04-0956, 2007 U.S. Dist. LEXIS 70687, at *16 (E.D.N.Y. Sep. 24, 2007) (rejecting *Plattner* case cited by Morgan Drexen; "Debt Melt Down Post Closing Program" was within the reach of the CROA despite defendant's "representations that deterioration of credit is not unusual during the" program).  Moreover, the credit improvement services do not have to be the only or even primary services offered or provided to fit the definition.  The Court in *Cortese* correctly noted that

> there is *nothing* in CROA's definition of credit repair organization that would lead this Court to conclude the credit repair services must be the principle or only services of the organization at issue.

*Id.* at *18 (emphasis added).

Deleting or removing invalid, negative, or detrimental information from a person's credit report is synonymous with improving that person's credit record and rating.  The debt validation letter Morgan Drexen generated expressly sought to improve the Wards' existing credit records based on "historical, tangible, and displayable data" by removing derogatory credit marks.  *See Hillis v. Equifax Consumer Servs., Inc.*, 237 F.R.D. 491, 512 (N.D. Ga. 2006).  Morgan Drexen,

thus, appeared to provide a service to the Wards of improving the Wards' credit record, credit history, or credit rating when it generated and sent the form debt validation letter to the Wards' creditor.

At the very least, Morgan Drexen's representations of "financial freedom," the language in the debt validation letter, and the representations on Morgan Drexen's websites about "re-establishing" and "improving" consumers' credit scores implied that it would improve the Wards' credit records, histories, or ratings. *Helms*, 436 F. Supp. 2d at 1231-32 (defendant who used words "establish" and "improve" in context of credit ratings on its websites was a credit repair organization); *see also Baker*, 440 F. Supp. 2d at 403-04 (rejecting debt management company's argument that it was not subject to the CROA because its services were aimed at reducing or eliminating interest fees, not improving credit scores).

### C. Plaintiffs Sufficiently Plead Violations of the CROA

The CROA prohibits credit repair organizations like Morgan Drexen from making or using untrue or misleading representations of the services provided to consumers. 15 U.S.C. § 1679b(a)(3). It also prohibits fraud or deception in connection with the offer or sale of services. § 1679b(a)(4). It also prohibits charging or receiving money or other valuable consideration for services before the service is fully performed. § 1679b(b). And it requires credit repair organizations

to make certain consumer disclosures.   § 1679c.   The Wards have sufficiently pleaded facts that plausibly show Morgan Drexen's actions violated the CROA.

### (i)   *15 U.S.C. § 1679b(a)(3)—Misrepresentations*

Morgan Drexen told the Wards that, in exchange for the fees the Wards would pay, Morgan Drexen would provide professional services that would lead to financial freedom.[47]   Morgan Drexen told the Wards that Howard | Nassiri would "be representing them through [the Wards'] journey to financial freedom."[48] Morgan Drexen knew, however, that the lawyers would provide little or no services to the Wards.[49]   Morgan Drexen did not tell the Wards that it, not the lawyers, would print and send form letters to the Wards' creditor.[50]

Morgan Drexen did not tell the Wards that when it came time to negotiate with the Wards' judgment creditor, the lawyer supposedly retained to represent the Wards would simply advise the Wards to negotiate with the creditor themselves, something the Wards could have done on their own for free.[51]   Morgan Drexen did not tell the Wards that it, not the lawyers, would ghost write a form letter to the Wards' creditor made to appear as if the Wards sent it themselves and make no

---

[47] FAC at ¶ 29.
[48] *Id.* at ¶ 34; Exhibit to FAC, Docket No. 8-1 at p. 17.
[49] FAC at ¶ 60.
[50] *Id.* at ¶¶ 34 & 38-40.
[51] *Id.* at ¶ 37.

mention of the lawyers supposedly retained to represent the Wards.[52]   Morgan Drexen did not tell the Wards that the Montana "lawyer" retained to represent them would never actually contact any of the Wards creditors.[53]

Plaintiffs allege that Morgan Drexen misrepresented the services it would provide the Wards to induce the Wards to enroll in Morgan Drexen's program and to allow Morgan Drexen to withdraw money from the Wards' bank account each month.[54]

Even if the misrepresentations were not made to induce the Wards to purchase services, Plaintiffs still state a claim under § 1679b(a)(3) because reliance is not required. *Helms*, 436 F. Supp. 2d at 1236-37 (§ 1679b(a)(3) only "requires … Plaintiff show Defendant made material statements, which would be untrue or misleading in the eyes of the least sophisticated consumer, that were widely disseminated and … consumers … purchased Defendant's service").

Section 1679b(a)(3) also does not require that the defendant be a credit repair organization. *Hillis*, 237 F.R.D. at 495 n.3 (§ 1679b(a)(3) "applies to 'any person'") (citing *Helms* and other cases).

The Wards also allege numerous misrepresentations Morgan Drexen made on its websites about improving credit ratings through participation in Morgan

---

[52] *Id.* at ¶ 38.
[53] *Id.* at ¶ 39.
[54] *Id.* at ¶¶ 33-36.

Drexen's program.[55]   Those misrepresentations, together with its written misrepresentations to the Wards, created the false "overall net impression" that Morgan Drexen would improve the Wards' credit records, histories, or ratings. "[S]tatements which create 'an overall net impression' of falsity may be actionable under ... § 1679b(a)(3)." *Slack v. Fair Isaac Corp.*, 390 F. Supp. 2d 906, 913 (N.D. Cal. 2005) (quoting *Gill*).   In addition, "implicit misrepresentations may properly be considered in determining whether the 'overall net impression' created by [the defendant's] website is misleading." *Id.*

### (ii) *15 U.S.C. § 1679b(a)(4)—Fraud or Deception*

The Wards' Complaint alleges more than a misrepresentation violation of the CROA.  The Wards have sufficiently alleged deception and fraud in connection with Morgan Drexen's offer and sale of its services to the Wards by engaging in the unauthorized practice of law and misleading the Wards to believe they were receiving valuable legal services.  As demonstrated in **Part Two** above, which the Wards incorporate by reference as if stated here *verbatim*, these acts and misrepresentations are sufficient to constitute fraud.

Morgan Drexen charged the Wards about $1,675 in fees, and the Wards received nothing in return.[56]   The Complaint adequately pleads fraud with

---

[55] *Id.* at ¶ 59.
[56] *Id.* at ¶¶ 33-35 & 42; Exhibit to FAC, Docket No. 8-1 at p. 17.

specificity.   Taking all reasonable inferences The Wards have stated a claim against Morgan Drexen under § 1679b(a)(4).

### (iii)   *15 U.S.C. § 1679b(b)—Mandatory Disclosures*

The Wards have also stated a claim under § 1679b(b) for noncompliance with the CROA disclosure requirements.  The Wards allege that Morgan Drexen charged the Wards fees before Morgan Drexen fully performed the services.[57] Morgan Drexen *agrees* that if it is a credit repair organization and charged the Wards fees before rendering any services, then Morgan Drexen violated the CROA.[58]  Even if Morgan Drexen had provided some services to the Wards, the Complaint sufficiently alleges that Morgan Drexen did not complete or fully perform the services it promised to perform before taking money from the Wards, which is in direct violation of § 1679b(b), which prohibits charging or receiving fees from a consumer "before such service is fully performed."

Morgan Drexen cannot dispute that if it is a credit repair organization, then it also violated §§ 1679c and 1679d of the CROA.  Plaintiffs have alleged, and Morgan Drexen does not dispute, that Morgan Drexen did not give the consumer disclosures required by either of those provisions.[59]

---

[57] FAC at ¶¶ 31-35, 42-43 & 60.
[58] Docket No. 26 at p. 18.
[59] FAC at ¶ 60.

For some reason, Morgan Drexen tries to pin Plaintiffs' CROA claims into a single claim under § 1679b(a)(4). As demonstrated above, however, Plaintiffs have stated several plausible claims against Morgan Drexen under the CROA, including §§ 1679b(a)(3), (a)(4), and (b).

### D.  Plaintiffs Sufficiently Plead Injury and Damages

Morgan Drexen induced the Wards to part with money and provided them with little or nothing in return. Under the CROA, "[a]ny person who fails to comply with any provision of [the CROA] ... shall be liable ... in an amount equal to ... any amount paid ... to the credit repair organization." § 1679g(a)(1)(B). "The CROA is a strict liability statute; if a defendant is within the purview of the CROA and fails to comply with its requirements, the defendant is liable without any showing of negligence, willfulness, or other intent." *Hillis*, 237 F.R.D. at 506. Under the CROA, successful plaintiffs are entitled to statutory damages equal to the amount paid to the defendant. *Id.* at 507.

Plaintiffs have sufficiently pleaded injury and damages. The Wards gave Morgan Drexen approximately $1,675 of their money for services and received little or nothing from Morgan Drexen in return.[60]

---

[60] FAC at ¶¶ 33-35 & 42; Exhibit to FAC, Docket No. 8-1 at p. 17; *see also* **Part Two**, subsection C above.

## E. **Plaintiffs Have Standing Under the CROA**

With its standing challenge, Morgan Drexen again attempts to limit the Wards' CROA claims to § 1679b(a)(4) and a reliance requirement.  As demonstrated above, however, the Complaint states violations of §§ 1679b(a)(3), (a)(4), and (b).

The excerpt from *Hillis* Morgan Drexen cites in support of its standing challenge involves analysis of a § 1679b(a)(3) misrepresentation claim and not a claim under § 1679b(a)(4).  Here is what the *Hillis* Court said about standing under the CROA:

> If Plaintiff could not recall seeing or hearing *any* of the representations that are cited in his Complaint, the Court would have serious concerns regarding Plaintiff's ability to show injury-in-fact sufficient to allow him to maintain a cause of action under ... § 1679b(a)(3).  In other words, if there was no evidence that Plaintiff saw or heard any of the representations alleged, there would be no injury to him, regardless of whether the representations may have been misleading or untrue to others.

237 F.R.D. at 499 (orig. emphasis).  The Court then held that because the plaintiff in *Hillis* "saw at least some of the representations" he alleged were misleading, he had standing under the CROA. *Id.*

So it is here.  The Wards' Complaint alleges numerous misrepresentations by Morgan Drexen regarding its services, several of which were mailed directly to the

Wards and reiterated on Morgan Drexen websites.[61]  The Wards saw, heard, and read "at least some of the representations" they allege violate the CROA even though they may not have seen or recall seeing every single misrepresentation made by Morgan Drexen about its services.  This is sufficient for CROA standing. *Id.*

Plaintiffs have also sufficiently alleged injury and damages under the CROA.  The Wards gave approximately $1,675 to Morgan Drexen for services, and in return received little or none of the services they thought they were purchasing.  The Wards' monetary loss is more than "fairly traceable" to Morgan Drexen's wrongful actions.  *Natural Res. Def. Council v. United States E.P.A.*, 542 F.3d 1235, 1244 (9th Cir. 2008).

Plaintiffs have standing under the CROA.

## PART FOUR—
## IF THE COMPLAINT CURRENTLY FAILS TO STATE A CLAIM THE WARDS ARE ENTITLED TO AMEND

Plaintiffs contend that their current allegations are sufficient and that they should be permitted to proceed toward trial.  If, however, the Court concludes that the Complaint is materially lacking in any respect, *Plaintiffs are entitled* to amend to cure any deficiency, and they request that the Court allow them to do so. *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 983 (9th Cir. 2000).

---

[61] *See* **Part Three**, subsection (C)(i) above.

## CONCLUSION AND REQUEST FOR RELIEF

Plaintiffs state plausible claims under civil RICO and the CROA.  The Court, therefore, should deny Morgan Drexen's Motion to Strike and Motion to Dismiss.  Plaintiffs request that the Court do so.

Dated this 19th day of April, 2010.

**BINGHAM & LEA, P.C.**

/s/ Royal B. Lea, III
Royal B. Lea, III
Attorneys for Plaintiffs

## **CERTIFICATE OF COMPLIANCE**

In accordance with Local Rule 7.1(d)(2)(E), the undersigned certifies that the foregoing response brief has been prepared in 14 point Times New Roman font, using Microsoft Office Word 2003.

This brief complies with Rule 7.1(d)(2).  This response brief contains 10,954 words, excluding the caption, table of contents, table of authorities, and certificates of service and compliance, as calculated by the word count function of Microsoft Office Word 2003.  Plaintiffs' unopposed request for leave to exceed the standard word limits of Rule 7.1(d)(2) in this response brief is pending.  (Docket No. 37).

/s/ Royal B. Lea, III
Royal B. Lea, III

S:\BRB\CLIENTS\2164.71\Pleadings\Ps' Memo Opposing Motion to Dismiss & Strike--FINAL DRAFT.doc